UNITED STATES of America, Appellee,

v.

Sahag K. DEDEYAN, Appellant.

No. 76–2393.

United States Court of Appeals,
Fourth Circuit.

Argued March 9, 1978.

Decided Sept. 19, 1978.

Michael E. Marr, Baltimore, Md. (Susan S. Myerberg, Baltimore, Md., on brief), for appellant.

Jervis S. Finney, U. S. Atty., Thomas L. Crowe, Asst. U. S. Atty., Baltimore, Md., for appellee.

Before WINTER and RUSSELL, Circuit Judges, and FIELD, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

After trial to a jury, the defendant-appellant was found guilty of failing to report the abstraction of a document relating to the national defense, in violation of 18 U.S.C. § 793(f)(2).[1] He was thereafter sen-

---

1. 18 U.S.C. § 793(f)(2), provides:

"Whoever being entrusted with or having lawful possession or control of any docu-

ment, writing * * * or information, relating to the national defense, * * * having knowledge that the same has been illegally

tenced to the custody of the Attorney General of the United States for a term of three years. He has appealed alleging numerous errors. We affirm.

In September, 1972, the defendant, a civilian mathematician, working on certain United States Department of Defense contracts in private industry, was assigned by his supervisor at the Johns Hopkins University Applied Physics Laboratory to conduct a Navy study.[2] An Air Force study previously made had recommended that airlift be given a greater role in sending American soldiers and supplies to Western Europe, but had not adequately considered the possibility of a Russian attack upon the airlift. The study to be made by the defendant was a re-examination of American plans to defend NATO [North Atlantic Treaty Organization] from a Russian and Warsaw Pact attack upon Western Europe in 1976.

The defendant worked on the project from late September, 1972, through Friday, March 30, 1973. On that date he assigned the study a preliminary "secret" classification and submitted copies to the project officer for the Chief of Naval Operations, who testified that he approved the classification "since it contained information that was secret."[3] The defendant took a copy of the study home with him in order to proof-read it.[4] On that same date, Friday, March 30th, a second cousin from New York arrived to visit defendant.[5] Defendant says he showed his cousin the cover of the Vulnerability Analysis and then replaced it in his brief case. On the next day while the defendant and his wife were out of the house, his cousin photographed the first seventy pages of the Vulnerability Analysis, using a miniature camera which had been supplied to him by a Soviet representative to the United States.

According to the defendant some eight months later his cousin told him that he had photographed part of the Vulnerability Analysis and gave the defendant $1,000, which the defendant said he understood was intended to be payment for his remaining silent.

Defendant's cousin [Paskalian] gave a confession in New York to the FBI admitting that he had committed espionage acts against the United States and involving the defendant. When defendant was confronted with this by the FBI, he denied any part of it, but after talking on the telephone to Paskalian in New York, at the suggestion of the FBI agent, he gave a written statement on January 23, 1975, and another one on June 24, 1975, clarifying the information given in his January 23, 1975 statement. These statements related the extent to which he was involved in the affair. He

removed from its proper place of custody or delivered to anyone in violation of his trust, or lost, or stolen, abstracted, or destroyed, and fails to make prompt report of such loss, theft, abstraction, or destruction to his superior officer—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. This study became the "Vulnerability Analysis: U. S. Reinforcement of NATO" involved here.

3. The study was typed on paper marked "Secret" at the top and bottom of each page, and on the cover of the study the following appeared:

"SECURITY NOTICES

"NATIONAL SECURITY INFORMATION: Unauthorized disclosure subject to criminal sanctions. DECLASSIFICATION SCHEDULE. This document is classified by source documents as listed in the bibliography. It is exempt from the General Declassification Schedule of Executive Order 11652 because it contains Category 3 information. The date for its declassification is December 31, 2002."

4. Defendant admitted that he knew this was a security violation.

5. The cousin, Sarkis Paskalian, had worked in the Mideast as an agent for the Russian Intelligence Service [KGB] from 1962 to 1966. He was inactive as an agent for five years and lived in New York City. In 1971 he was recalled to Armenia [one of the Republics of the Soviet Union] for further training and was then ordered to return to the United States and to obtain information from Dedeyan [defendant]. It is not clear from the record whether the defendant knew at this time that Paskalian was engaged in espionage activity. The defendant's written statements place the time at which he learned of this as two months after the visit in March, 1973, and at this time he promised Paskalian that he would remain silent.

admitted that he had promised Paskalian to remain silent and that he had not reported the abstraction of the Vulnerability Analysis document.

The prosecution witnesses testified that the photographed part of the Vulnerability Analysis contained information "significantly related to the national defense, important and secret" and that the document was capable of being used to the injury of the United States or to the advantage of a foreign national because it afforded an enemy significant insight into the United States' plans to reinforce NATO and significant help in opposing that reinforcement effort; that the compromise of the Vulnerability Analysis revealed to the Soviets intelligence of the United States about their strategic interceptors, which particular interceptors to that date were so secret that the Soviets had never deployed them to any foreign country, including other Warsaw Pact members, and enabled them to afford the information greater protection; and that the document had been typed on paper preprinted with the word "Secret" at the top and bottom of each sheet and the author [the defendant] had marked the document "Secret."

The defense witnesses, on the other hand, testified that in their opinion the document did not relate to the national defense. However, on cross-examination two of the defense witnesses testified that the resupplying and defense of NATO were fundamental to the national defense of the United States; that the Vulnerability Analysis would be of value to a Soviet intelligence officer because it would reveal weaknesses in his security measures and would help him to close leaks; and that depending upon the information the Soviets had available, compromise of the Vulnerability Analysis could lead to loss of intelligence sources.

The defendant's first assignment of error is that the Trial Court erred in refusing to dismiss the indictment for the reason that the statute is unconstitutional as (a) vague, (b) overbroad, and (c) applied to him.

No case has been cited to us, and we have found none, construing the statute involved here. Its predecessor [6] was held to be constitutional by the Supreme Court in *Gorin v. United States* (1941) 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488, and is cited by both sides.

■ The defendant's claim of vagueness is directed at the phrase "relating to the national defense" in the statute. We do not find this phrase vague in the constitutional sense. It was included in the predecessor statute. In construing that predecessor statute the Supreme Court in *Gorin v. United States, supra,* 312 U.S. at 28, 61 S.Ct. 429 found that the phrase has a "well understood connotation" and is not impermissibly vague.

■ Defendant argues, however, that the statute is unconstitutionally vague without the addition of a scienter requirement, *i. e.,* knowledge that the compromise of the document would injure the United States or aid another country. Subsection (f)(2) does contain a scienter requirement: knowledge of the document's illegal abstraction, and as the District Court held "[c]ertainly injury to the United States could be inferred from conduct of [the] sort charged."

■ The defendant would also find the statute overbroad in violation of the First and Fifth Amendments. As the District Court said "[e]ven assuming the merits of defendant's argument, the problem of overbreadth may be cured by a limiting construction of 793(f)." [7] The Court gave a limiting instruction to the jury that in order to show relationship to the national defense, the Government must prove that

"disclosure of information in the document would be potentially damaging to the national defense, or that information in the document disclosed might be useful to an enemy of the United States.

"Information about weapons, munitions of war and intelligence which has been made public by Congress or the Department of Defense and is found in sources

---

**6.** Espionage Act of June 15, 1917, c. 30, 40 Stat. 217, 50 U.S.C. § 31, *et seq.*

**7.** *United States v. Heine* (2d Cir. 1945) 151 F.2d 813, 815–817.

lawfully available to the general public does not relate to the national defense. "Similarly, where the sources of information are lawfully available to the public, and the United States and the Department of Defense have made no effort to guard such information, the information itself does not relate to the national defense."

The Court then stated the proposition conversely. By this limiting charge any problem of overbreadth was cured.[8]

■ Because the statute provides for the reporting by the custodian of the document of its abstraction "to his superior officer" the defendant argues that the statute is unconstitutional as applied to him for the reason that he is neither in the military nor a government employee. However, the statute applies to "*[w]hoever* [is] entrusted with or [has] lawful possession or control of any document, [or] writing," (emphasis added) and clearly applies to one in defendant's position.

■ The second assignment of error is that the Trial Court erred in denying defendant's motion to strike the words "classified 'Secret'" from the indictment, the defendant arguing that such a description of the document in question is irrelevant, prejudicial surplusage. The defendant, who originated the document, himself marked it "secret" and furthermore, indicating his belief that it was secret material, typed it on paper with the word "secret" at the top and bottom of each sheet. The Trial Court held that the words were not surplusage in the indictment and were relevant to the charge, tending "to show or make more probable that the document does, in fact relate to the national defense within the meaning of Section 793(f)." We believe the Court did not abuse its discretion in so ruling.

■ Third, the defendant asserts that the Trial Court erred in refusing to permit defendant's opinion testimony with respect to abuses of the Government's system of classification of information. From an examination of the record, it is our opinion that the Court was very lenient in allowing testimony on the unreliability of the classification system of the Government. Such limitations as were imposed by the Court, and its instructions to disregard evidence of unrelated specific instances of abuses, were proper.

■ The defendant assigns as the fourth error that the Trial Court unfairly permitted the trial to be permeated with evidence and testimony about classification and national security privileges, the cumulative effect of which was to deny defendant a fair trial. We find this assignment of error to be meritless. Such effect as evidence concerning classification and national security privileges may have had, resulted primarily from the intentional efforts of the defendant, as it was the main thrust of his defense that the document was classified improperly and therefore could not relate to the national defense. The greater part of the evidence on classification having been introduced by the defendant, he cannot now be heard to complain.

■ Fifth, the defendant says the Trial Court denied him his right of confrontation of witnesses by restricting cross-examination. Our examination of the record shows that the Court acted properly, restricting cross-examination only where the information sought concerned national defense, and had little, if any, relevance to the issues in this case.

The defendant's sixth assignment of error that the Court erred in refusing to grant defendant's motions for judgment of acquittal on the ground that the document in question was not properly classified according to the relevant Executive order, and was therefore lawfully available pursuant to the Freedom of Information Act, and therefore not properly the subject of a criminal prosecution; the seventh assignment of error that the Court erred in re-

---

8. *See, United States v. Gorin, supra,* 312 U.S. at 28, 61 S.Ct. 429; *United States v. Heine, supra,* 151 F.2d at 815–817.

fusing to instruct the jury that if they did not find beyond a reasonable doubt that the document or the information contained therein was required by Executive Order to be kept secret, then they should acquit; and the eighth assignment of error that the Court erroneously instructed the jury as to the legal definition of "relating to the national defense," we find to be without merit.

■ Even though the classification procedure was not followed entirely in this case, the evidence shows that information contained in the Vulnerability Analysis was secret information and related to the national defense. The Freedom of Information Act, existing at the time, does not apply to matters required by Executive Order[9] to be kept secret "in the interest of national defense."[10] Information contained in the Vulnerability Analysis therefore was not available to the public under the Freedom of Information Act. *See,* *EPA v. Mink* (1973) 410 U.S. 73, 81, 93 S.Ct. 827, 833, 35 L.Ed.2d 119, where the Court said: "Subsection (b)(1) of the Act [Freedom of Information Act] exempts from forced disclosure matters 'specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy.' "

■ The Court's charge was fair and impartial and left to the jury the determination of the classification issue and its bearing, if any, upon whether the Vulnerability Analysis related to the national defense. The Court read to the jury parts of Executive Order # 11652 by which it stated the "classification of this document is controlled." The Court clearly and correctly defined "relating to the national defense."

9. Executive Order # 11652 provides in pertinent part:
   "Within the Federal Government there is some official information and material which, because it bears directly on the effectiveness of our national defense and the conduct of our foreign relations, must be subject to some constraints for the security of our Nation and the safety of our people and our allies. To protect against actions hostile to the United States, of both an overt and cov-

For the foregoing reasons, the judgment of conviction is

*AFFIRMED.*

ert nature, it is essential that such official information and material be given only limited dissemination. *This official information or material, referred to as classified information or material in this order, is expressly exempted from public disclosure by Section 552(b)(1) of Title 5, United States Code.* * * * " (Emphasis added)

10. 552(b)(1), 5 U.S.C.