UNITED STATES of America

v.

**Samuel Loring MORISON.**

**Crim. No. Y–84–00455.**

United States District Court,
D. Maryland.

March 12, 1985.

---

6. The Clerk of Court is directed to inform counsel of the filing of this order immediately upon receipt of the order.

J. Frederick Motz, U.S. Atty., and Michael Schatzow, Asst. U.S. Atty., Baltimore, Md., for plaintiff.

Jacob A. Stein, Robert F. Muse, Rockville, Md., Armistead P. Rood, and Mark H. Lynch, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

Samuel Loring Morison is charged with releasing copies of three photographs, classified "secret," to *Jane's Defense Weekly* ("Jane's"), a British magazine. Morison had been associated with *Jane's* prior to the time that the photographs were released and was paid as an American "editor" of *Jane's*. Count I of the Indictment charges that Morison wilfully caused the photographs, which allegedly related to the national defense, to be transmitted to a person not entitled to receive them, in violation of 18 U.S.C. § 793(d). Count II

charges Morison with the theft or conversion of those same three photographs, in violation of 18 U.S.C. § 641.

Morison is also charged with two other counts arising out of a separate incident. During the spring of 1984 there was an explosion at Severomorsk, a Soviet naval base in the Kola Peninsula. Subsequently, analysts at the Naval Intelligence Support Center ("NISC"), where Morison was employed, did a report, based on classified information, concerning the nature and extent of the damage to the base. That analysis was reported in one of NISC's "Weekly Wires." When Morison's residence was searched, pursuant to a warrant following his arrest, xeroxed pages containing that analysis were found in an envelope marked "Derek Wood." Derek Wood was later found to be one of Morison's contacts at *Jane's*. When the typewriter ribbon from Morison's office was analyzed it was discovered that Morison had typed a letter to Derek Wood summarizing the contents of that analysis. Count III charges Morison with unauthorized possession of classified documents, wilfully retaining them and failing to deliver them to the officer or employee of the United States entitled to receive them, in violation of 18 U.S.C. § 793(e). Count IV charges Morison with theft and disposal or conversion of government property, namely those "Weekly Wires" containing the intelligence analysis of the Severomorsk incident.

Defendant Morison has filed this motion to dismiss the Indictment based on a number of grounds. He claims that the law under which he is charged in Counts I and III of the Indictment, 18 U.S.C. § 793(d) and (e), is unconstitutionally vague and overbroad and that the law, which is part of the so-called "espionage act," was intended to punish only "espionage" in the classic sense of divulging information to agents of a hostile foreign government and not to punish the "leaking" of classified information to the press. Morison also claims that 18 U.S.C. § 641, which punishes the theft or conversion of government property without authorization, does not

apply to the theft of information and that therefore Counts II and IV should be dismissed.

The relevant law under which Morison is charged in Counts I and III is found in 18 U.S.C. § 793(d) and (e), part of a broader espionage statute. Section 793(d) provides that whoever, having authorized possession or control of a document or photograph, relating to the national defense, or information relating to the national defense, which information the possessor had reason to believe could be used to the injury of the United States, and who wilfully delivers it to any person not entitled to receive it, or wilfully retains it and fails to deliver it to the officer or employee entitled to receive it, is guilty of the offense. Section 793(e) is basically the same provision, except that it refers to situations where the defendant is in unauthorized possession. Defendant Morison is charged under § 793(d) with wilfully delivering the photographs to *Jane's*, which was not entitled to receive them, and under § 793(e) with wilfully retaining and failing to return the Weekly Wires containing intelligence information. Morison's possession of the intelligence reports at his home is said to be unauthorized..

Morison is also charged under 18 U.S.C. § 641 with theft of government property, the photographs and intelligence analysis which were allegedly sent to *Jane's*. 18 U.S.C. § 641 is a general statute covering all thefts and embezzlements of government property or "things of value." Penalties for violation of the statute are determined in part by the value of the property which the government alleges was greater than $100, based in part on the payments that Morison received from *Jane's* for that information.

Morison alleges that 18 U.S.C. § 793(d) and (e) are impermissibly vague and overbroad, and that given their status as espionage statutes they are not properly applied to a "leak" case. He also asserts that § 793(e) is unconstitutional because it requires a surrender of one's Fifth Amendment right against self-incrimination. Mor-

ison also alleges that 18 U.S.C. § 641 is impermissibly vague and overbroad as applied to the theft of government information. Finally, if all else fails, Morison seeks to reserve the right to present evidence on the issue of selective prosecution, acknowledging that he does not have a factual basis for that defense.

■ Morison's first attack on Sections 793(d) and (e) is that the term "relating to the national defense" is impermissibly vague and fails to give fair warning of what documents are covered by the statute. This argument relies heavily on the Supreme Court's reasoning in *Gorin v. United States*, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941), which arose under the predecessor statute to § 793. In that case, the Court held there was no uncertainty in a statute prohibiting the delivery of information relating to the national defense where the statute contained obvious "delimiting words" requiring intent or reason to believe that the information is to be used to the injury of the United States. Morison argues that the Court in *Gorin* declined to hold the statute void for vagueness only because of the presence of the intent requirement, and that because §§ 793(d) and (e) do not contain such an intent requirement, the statutory provisions are void for vagueness.

The government has responded to this assertion by noting that the statute does contain an intent requirement, although not the same requirement that was contained in the *Gorin* statute. Sections 793(d) and (e) require that the acts be done "wilfully;" if the transmitted item is "information" "which information the possessor had reason to believe could be used to the injury of the United States." That requirement is not present for the delivery or retention of photographs or documents. The government contends that if a defendant, "such as Morison, wilfully transmits photographs relating to the national defense to someone who is known by the defendant not to be entitled to receive it, the defendant has violated § 793(d) no matter how laudable his motives." According to the plain lan-

guage of the statute, the government's interpretation is correct.

Thus, although there is an intent requirement, the "delimiting" intent to injure the United States is not present in this statute and defendant argues that it is therefore impermissibly vague. Unfortunately for the defendant's argument, the Fourth Circuit has addressed this issue and found that a similar statute was not unconstitutionally vague. In *United States v. Dedeyan*, 584 F.2d 36 (4th Cir.1978), the Fourth Circuit construed 18 U.S.C. § 793(f), which provides that anyone with authorized possession of documents or writing relating to the national defense, having knowledge that the same had been illegally removed or abstracted and failed to report it, is guilty of a violation of the statute. The statute does not require any intent to injure the United States or any "guilty knowledge" that the document or writing was removed or abstracted by an enemy of the United States. Defendant in that case was charged with knowing that his cousin, later found to be a Russian agent, had photographed classified information, and with failing to report it. On appeal, the defendant charged that the term "relating to the national defense" was impermissibly vague unless a scienter requirement was added. The Court found that the scienter requirement in the statute was sufficient: knowledge of the document's illegal abstraction. The Court concluded, "[t]he defendant's claim of vagueness is directed at the phrase 'relating to the national defense' in the statute. We do not find this phrase vague in the constitutional sense." That holding applies with equal force in this case, where the only scienter required is the wilful transmission or delivery to one not entitled to receive it. As the District Court noted in *Dedeyan*, "[c]ertainly injury to the United States could be inferred from

conduct of the sort charged," whether that conduct involves photographing documents by one foreign agent or release of national defense information to the press and public, where many foreign agents and governments can have access to the information.

In his reply brief, defendant argues that the holding in *Dedeyan* should not be controlling because Dedeyan involved the classic espionage situation, while this case arguably does not. In *Dedeyan*, the defendant was accused of knowing that the document had been abstracted by his cousin, a Russian spy, and failed to report it. Here, the situation is slightly different because it does not involve a foreign agent or the classic spy scenario. Rather, the defendant is accused of releasing classified information to the press, thus exposing that classified information to every foreign agent and government, hostile or not, in the world.

Defendant cites an impressive wealth of legislative history suggesting that § 793 was only meant to apply in the classic espionage setting. Most of defendant's opposition to the statute's application centers on this point. He cites phrases in the legislative history indicating that only spies and saboteurs need fear prosecution under this statute, and argues that since he is neither a spy nor a saboteur, this prosecution is unwarranted.

■ While it is, of course, impossible to determine exactly what Congress meant when it passed the statute, it is more likely that the type of activity that defendant allegedly engaged in was meant to be covered. Congress could very easily have meant, when it used the word "spy," one who used his position and classified security clearance to obtain information to which he would not otherwise be entitled and release it to the world.*

---

* The dictionary (Webster's Third New International Dictionary [unabridged] (1971)) defines "spy" as "one who keeps secret watch upon a person or thing to obtain information; one engaged in seeking strategic unrelated information about a country or people by secret methods of infiltration or investigation." Only one defini-

tion mentions the requirement of transmission to foreign agents which defendant argues is so crucial to the congressional intent: "one who acts in a clandestine manner or on false pretenses to obtain information in the zone of a belligerent with intention of communicating it to the hostile party." It is also conceivable that

If Congress had intended this situation to apply only to the classic espionage situation, where the information is leaked to an agent of a foreign and presumably hostile government, then it could have said so by using the words "transmit ... to an agent of a foreign government." In 18 U.S.C. § 794, Congress did precisely that, proscribing the gathering or delivering of national defense information to a foreign government or to an agent, employee, subject or citizen thereof. Section 793, on the other hand, proscribes disclosure of national defense information to those "not entitled to receive it."

Finally, the danger to the United States is just as great when this information is released to the press as when it is released to an agent of a foreign government. The fear in releasing this type of information is that it gives other nations information concerning the intelligence gathering capabilities of the United States. That fear is realized whether the information is released to the world at large or whether it is released only to specific spies.

Defendant claims that by enforcing this statute in the present case involving the release of information to the press, this Court would be writing a new law, a task, it is argued, better left to the legislature. On the contrary, to read into the statute the requirement that it apply only in "classic espionage" cases where the disclosure is to an agent of a foreign government would be to ignore the plain language of the law as presently written. The statute clearly applies to disclosures of information relating to the national defense to those "not entitled to receive" such information. Any requirement that those not entitled to receive also be foreign agents must be added, if at all, by Congress.

■ Defendant also claims that if §§ 793(d) and (e) are construed to apply to

Congress, in 1950 when the statute was amended, would have considered a person who "leaked" national defense information to the press a "saboteur" or one who would "weaken the internal security of the Nation" and thus subject to prosecution under the provision of the statute.

"leaks," then these statutes would be duplicative of other statutes Congress has chosen to pass. Defendant argues, therefore, that Congress could not have intended § 793(d) and (e) to have the meaning we now give it. In fact, the statutes which the defendant cites (Atomic Energy Act, 42 U.S.C. §§ 2274, 2277, 50 U.S.C. § 601) fill in gaps and prevent disclosures which would *not* otherwise be covered by § 793(d) and (e). The Atomic Energy Act, for example, prevents the disclosure of restricted data concerning nuclear weapons, material and energy to "any person." There is no requirement that the data relate to the national defense, and disclosure to any person is prohibited. Similarly, 50 U.S.C. § 601 prohibits the disclosure of the names of covert agents. Such information may not relate to the national defense; further, § 793(d) and (e) would require proof of reason to believe that disclosure would injure the United States, and 50 U.S.C. § 601 may be designed to do away with that requirement. Thus, § 793(d) and (e), as construed by this Court, is not duplicative of other statutes, and there is no reason to believe that Congress did not intend § 793 to have this meaning.

## OVERBREADTH

■ Defendant also contends that Sections 793(d) and (e) are unconstitutionally overbroad because they proscribe disclosure and retention of documents relating to the national defense "which are perfectly harmless and clearly protected by the First Amendment as well as those which might lawfully be regulated because of a compelling governmental interest in secrecy." This argument has been considered and rejected by the Fourth Circuit. When faced with this issue in *Dedeyan*, the Court attempted to cure any possible overbreadth by using a limiting jury instruction. The

The best guidance in determining the intent of Congress, and the first place for this Court to look in construing the statute, is the wording of the statute itself.

definition of "relating to the national defense" which, following *Dedeyan*, would be used in the Fourth Circuit would cure any possible defect of overbreadth. In *Dedeyan*, the trial court gave a limiting instruction requiring that to show relationship to the national defense, the government must show various things, *see* 584 F.2d at 39–40. The Fourth Circuit approved that procedure, noting that this limiting charge cured any problem of overbreadth. 584 F.2d at 40. Such an instruction would alleviate the possibility that any harmless material would be covered by the statute, as defendant has claimed.

■ Defendant next argues that the phrase "not entitled to receive" is also unconstitutionally vague, in that it fails to inform a citizen of whether his conduct is prohibited. Morison claims that because the phrase "not entitled to receive" has never been conclusively defined, there is an ambiguity in the statute that leads to an uncertainty as to the statute's application. Morison notes that the General Counsel to the CIA has informed Congress that §§ 793(d) and (e) may not apply to leaks to the press depending on the interpretation of that phrase. The Department of Justice, however, has clearly indicated its belief that these sections apply to "leaks" to the press. Morison argues that the fact that these two executive departments disagree is a clear indication that the average citizen cannot possibly be sure of the state's application. The government has responded by pointing out that under no circumstances is that statute unconstitutionally vague when applied to this defendant, who clearly knew by virtue of his security clearance and his signing of an agreement that classified information and documents were not to be transmitted to outsiders. Morison worked in a vaulted area, which even other employees of NISC were not allowed to enter, and therefore certainly should have known that documents were not to be disseminated to outsiders. The phrase "not entitled to receive" may therefore be given content by reference to the classification system. In *United States v. Girard*, 601 F.2d 69, 71–

72 (2d Cir.1979), a case concerning the theft of government (DEA) information from a DEA computer, the Second Circuit held:

> appellants, at the time of the crime a current and a former employee of the· DEA, must have known that the sale of DEA confidential law enforcement records was prohibited. The DEA's own rules and regulations forbidding such disclosure may be considered as both a delimit and a clarification of the conduct proscribed by the statute. [citations omitted]

Applying that same principle here, it seems clear that authorization to possess documents and entitlement to receive them may be determined by reference to the classification system under which the defendant worked.

Defendant argues that the classification system should not be used to give content to the phrase "not entitled to receive" because Congress has on several occasions declined to enforce the classification system with criminal sanctions, and the court in giving the phrase that construction would do what Congress had declined to do. On the contrary, the President has established a system of classification and this Court may enforce it. Congress has recognized the classification system and given its support to the determination by Executive Order of who is authorized to possess and who is not authorized to possess classified information, *i.e.*, in the Freedom of Information Act, the Internal Security Act of 1950, and in 50 U.S.C. § 783(b), which makes criminal the communication of classified information to certain persons unless authorized by the President or relevant officials. As noted in the Report of the Interdepartmental Group on Authorized Disclosure of Classified Information (March 12, 1982) ("the Willard Report"), filed by and relied on heavily by the defendant, Executive Orders have provided for a system of classification to guard national security information. Since these executive orders are issued in fulfillment of the President's Constitutional responsibilities, they have the force and effect of law.

The Willard Report also states clearly that "classified information" is covered by §§ 793(d) and (e) unless "it could not fairly be characterized as 'relating to the national defense." The phrase "not entitled to receive" is not at all vague when discussed in reference with the classification system, which clearly sets out who is entitled to receive (those with proper security clearances and the "need to know") and Morison was certainly aware of the proscripts of the classification system.

Defendant has argued that even if this construction is given to the statute, the statute is impermissibly vague because then an individual would be left to make the determination of who has the "need to know," and therefore the right to receive classification information. There can be no argument of such vagueness here, where the defendant released the information to *Jane's*, which had neither a security clearance or a need to know.

The Fourth Circuit has also relied on the classification system to approve a trial court's definition of "unauthorized possession" in terms of appropriate security clearance and performance of official duties. *See United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir.1980), in which the court noted:

> Section 793(e) contains another possible ambiguity. It punishes only those who have "unauthorized possession" of national defense information. The trial judge provided adequate content for this phrase by advising the jury that a person would have authorized possession if he had an appropriate security clearance and if he gained access to the document because it was necessary to the performance of his official duties.

629 F.2d at 919, n. 10. A similar limiting instruction in this case could cure the ambiguity of which the defendant complains.

### SELF–INCRIMINATION

■ Morison also argues that § 793(e) is unconstitutional because it requires a sacrifice of the Fifth Amendment right against self-incrimination. Section 793(e) provides that one who is in unauthorized possession of a document or information and who wilfully retains it or fails to deliver it to the official entitled to receive it is guilty of an offense. Defendant argues that this is "tantamount to a requirement that one who determines that he is in unauthorized possession of documents covered by this section must disclose this fact to a government official." The government has responded by noting that the documents could be returned anonymously, an argument which the defendant calls "ingenuous." There is some merit to the defendant's argument that an anonymous return would not solve the problem, because the government could find out through fingerprint analysis, etc. who had been in possession of the document. One wonders, however, who the government would prosecute after going to all that trouble. The statute does not punish or prohibit simply being in unauthorized possession; the statute punishes those who, finding themselves in unauthorized possession, wilfully retain or fail to return to the proper government official. Therefore, an individual would not incriminate himself by publicly returning a document to the proper official, because the second element of the crime would not be present. The statute on its face therefore does not require a defendant to sacrifice his right against self-incrimination and is not unconstitutional.

### CONSTRUCTION OF "WILFULLY"

■ In his reply brief, the defendant has argued that the Indictment should be dismissed because the government has no intention of proving the requisite level of culpability. This is evident, argues the defendant, from the government's contention that it must only show that the disclosure or retention was done "wilfully," which the government defines as "an intentional violation of a known legal duty," citing *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976). Morison argues that the word "wilfully" connotes some evil purpose, and that since the government has indicated that it need not

prove evil purpose, the Indictment must be dismissed.

It seems clear that either under the government's definition of "wilfully" or under Morison's definition, the government need not prove evil purpose. Morison may plan to argue that he disclosed these photographs in the interest in public discussion of defense, that his motives were only the best, and that therefore he is not guilty.

Morison urges that the requirement that acts be done wilfully translates to a requirement that they be done with some evil purpose and that if he acted with an intent to inform the public he did not have the requisite evil purpose. He urges this Court to adopt a construction of the word wilfully used in *Hartzel v. United States*, 322 U.S. 680, 686, 64 S.Ct. 1233, 1236, 88 L.Ed. 1534 (1944). In that case, the court, noting that the statute was a highly penal one restricting freedom of expression, held that the word "wilful" must be taken to mean "deliberately and with a specific purpose to do the acts proscribed by Congress." In another sentence, the Court referred to this "evil purpose;" however, in the rest of the opinion the court refers only to the specific intent to do the evil prohibited by the statute, *i.e.*, causing or attempting to cause insubordination, disloyalty, or mutiny. That case did not require "evil purpose" as the defendant reads it, but only required that the prohibited acts be done deliberately and with a specific purpose to do that which was prohibited. In *Truong Dinh Hung*, 629 F.2d at 919, the court discussed the trial court's instruction that "wilfully" meant "not prompted by an honest mistake as to one's duties, but prompted by some personal or underhanded motive" and apparently approved such an instruction. It seems clear that the defendant here will not find much comfort in his defense that he did what he did with good intentions, unless he can also assert a defense that he did not do so "wilfully."

## APPLICATION OF SECTION 641 TO THEFT OF CLASSIFIED INFORMATION

■ As the defendant properly notes, there has been no definitive court test of the applicability of 18 U.S.C. § 641 to unauthorized disclosures of classified information. Section 641 is a general statute prohibiting the theft or embezzlement of "things of value" belonging to the government. The first application of § 641 to the theft of government information came in *United States v. Ellsberg*, 687 F.2d 1316 (10th Cir.1982), but that case was aborted because of prosecutorial misconduct. Since then, the government has attempted to apply that section in two other cases involving the disclosure of classified information, *see Truong*, 629 F.2d at 919, *United States v. Boyce*, 594 F.2d 1246, 1252 (9th Cir. 1979). In both those cases, the district court allowed the case to proceed under § 641 despite objections that § 641 was unconstitutional as applied to the theft of government information, but in both cases the Court of Appeals declined to reach the issue on appeal because of the concurrent sentence doctrine.

However, in *Truong*, Judge Winter wrote a separate opinion indicating that he would have reached the § 641 issue and would have found that § 641 could not be applied to the theft of government classified information. The defendant in this case has basically adopted the reasoning of Judge Winter, arguing that § 641 is unconstitutionally vague, and that that section makes it a crime for one "without authority" to sell or otherwise dispose of government property. Judge Winter's theory and defendant's argument is that the phrase "without authority" is unconstitutionally vague.

Section 641 has been applied to other cases involving thefts of government information, *see United States v. Girard*, 601 F.2d 69 (2d Cir.1979) (theft of DEA information); *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). However, its application in cases involving the theft of classified information, where the "authority" or lack thereof must come from reference to the classification system, has not been approved in any case which has reached the issue at the circuit level.

In *Boyee*, and *Truong*, the defendants were convicted under § 641 for thefts of government classified documents, but as noted, the Court of Appeals did not reach the issue on appeal because of the concurrent sentence rule.

The government has argued that Judge Winter's conclusion is wrong, that it disregards the fact that Congress at different times may, in different ways, reach the same conduct with different criminal statutes. The language of the statute reaches "intangibles" such as information, and the government argues, thus the theft of classified documents would be covered by such a statute.

However, the Court does not have to grapple with the separate opinion in *Truong*. That portion of the opinion was stated in a case where the majority did not reach the issue and it is not controlling. The Court also notes other district courts have allowed prosecution under § 641 for similar conduct.

■ Defendant has also argued that even if § 641 can be applied to the unauthorized taking of government information in this case, it should not be applied where the taking involves public disclosure in circumstances which implicate First Amendment issues. Defendant argues again that in all cases in which § 641 has been applied to the theft of information, the information was being acquired for private, covert use in illegal enterprises. *See Truong, Boyce, Girard.* He argues that there are separate issues when the Court must deal with the assertion of First Amendment rights and that because the danger of insensitivity to the First Amendment is great, the government may not use a general law not specifically aimed at expressive conduct to regulate such conduct. Defendant argues that using § 641 to regulate the disclosure of government information gives executive branch officials unbridled discretion to enforce the statute and thereby control the flow of government information to the public. Thus, government officials would be free to enforce the statute and thereby control the flow of government information

to the public. Thus, government officials would be free to enforce their own information control policy, and liability may turn on nothing more than the fact that the disclosure embarasses them or subjects them to public criticism.

These arguments have little to do with this case. It is most doubtful that Morison was asserting a First Amendment right in selling photographs and documents to *Jane's.* Where the phrase "without authority" is given content by reference to the classification system, then the disclosures that could be punished under § 641 would be those where the government has asserted an interest in secrecy by classifying a document or information "secret." It is clear that having decided that disclosures of classified information may be prosecuted under § 641, the defendant's motive in disclosing classified information is irrelevant.

Finally, the defendant has argued that the government cannot establish the theft of a thing of value worth more than $100 and the Indictment should be dismissed. Morison argues that the statute applies only to things, not to intangibles, but that argument has been rejected by many courts. *See, e.g., Girard,* 601 F.2d at 69 (theft of DEA information); *Friedman,* 455 F.2d at 1076 (theft of grand jury information). Morison also argues that the government must establish that it was permanently deprived of the objects, but that claim too has been rejected. *United States v. DiGilio,* 538 F.2d 972 (3d Cir.1976), *cert. denied, sub. nom., Lupo v. United States,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Finally, Morison says that since the materials he used to copy these things are not worth $100, there is no violation of the statute.

■ The government has asserted that it will prove that the things were worth more than $100, and they must be given an opportunity to do so. A reading of the statute would indicate that the value of the "thing" is determinative only of the appropriate penalty. Finally, the statute itself defines one measure of "value" as "market value" and the government has

alleged that the market value of these documents is greater than $100, as evidenced by the fact that *Jane's* paid more than $100. The Indictment will not be dismissed because of this claim.