UNITED STATES

v.

Stuart E. BERLIN, et al.

Crim. No. 89–00007–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 28, 1989.

Thomas Patten, Maureen Mahoney, Latham & Watkins, Plato Cacheris, Dunnells, Duvall, Bennett & Porter, Washington, D.C., for Teledyne Corp.

Mark Tuohey, Pierson, Ball & Dowd, Washington, D.C., for George Kaub.

George O'Connell, Jeffrey Isaacs, Miller & O'Connell, Los Angeles, Cal., for Eugene Sullivan.

R. Stan Mortenson, Jamie S. Gorelick, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Dale Schnittjer.

Gerald Treanor, Amy S. Berman, Venable, Baetjer, Howard & Civiletti, Washington, D.C., for William Parkin.

James Twitty, Beverly Hills, Cal., for Fred Lackner.

Jeffrey Harris, Leonard C. Greenebaum, Sachs, Greenebaum & Taylor, Washington, D.C., for Stuart Berlin.

Joseph Aronica, Jack Hanly, U.S. Attorney's Office, Alexandria, Va., for U.S.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This case is before the Court on the defendants' various substantive motions. After consideration of the briefs and oral arguments of counsel, the Court makes the following rulings.

### I. Collective Motions

There are three motions urged by all defendants (except Lackner): motions to suppress the wiretap tapes, to dismiss the wire fraud counts (10–17 and 18–21), and to dismiss Count 1 (conspiracy) and Counts 26–27 (RICO).

*1. Motions to Suppress Fruits of Electronic Surveillance*

All defendants argue (1) the original affidavits supporting wiretaps on Parkin's phones lacked probable cause (Berlin also makes this argument against the affidavit requesting a tap on Lackner's phone); (2) the affidavits failed adequately to state

why traditional methods of investigation would not have worked; and (3) the government failed to minimize irrelevant conversations.

■ The facts in the original affidavit regarding Parkin's phones came principally from an informant, John Marlowe (the "Pierce affidavit"). The defendants argue that this was Marlowe's first job as an informant, and the affidavit's bare bones conclusion that Marlowe's information had been verified was insufficient. Berlin, addressing the wiretap on Lackner's phone, points to a paragraph in the affidavit (the "Miller affidavit") that states the government seeks to determine whether Berlin has been involved in any *other* procurement fraud in which Parkin was not a party, and argues that this could not support a tap because the government merely said that it was "logical to assume" that Berlin was involved in other fraud.

Neither of these has merit, because the affidavits as a whole presented more probable cause than the defendants suggest. As to Parkin and Teledyne, the Pierce affidavit relied not only on Marlowe but on 64 consensual recordings of Marlowe, Parkin and others, as well as physical surveillance. In Berlin's case, the Miller affidavit makes clear that the government sought the Lackner tap not only for other fraud but to intercept possible conversations with Parkin, in an effort to tie Berlin into the Lackner–Parkin activity with respect to Teledyne and Hazeltine.

■ Next, the defendants argue that the government did not adequately explain why other methods were insufficient. The law does not require the government to exhaust all alternatives, but it does require agents to explain why traditional methods would not work. *U.S. v. Clerkley*, 556 F.2d 709 (4th Cir.1977), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978). The affidavits here met the burden. Pen registers, toll records and physical surveillance would not have worked because agents needed to know the *substance* of conversations, not just who was called or who Parkin met (e.g., Pierce Affidavit para. 76). Also, because the targets

of the investigation presumably were well connected in the government, any effort to investigate by interviewing government employees or reviewing records would quickly get back to Parkin and evidence would be lost (*Id.* para. 88, 93). The defendants suggest that the risk of discovery is present in all cases, but the agent's belief that Parkin's connections would have made him especially aware justify Pierce's reasoning. Agents at that time also did not know where financial records might be kept, so search warrants might well have turned up nothing and alerted the defendants. Finally, the agent explained that because defense contractors tend to know each other, socialize together and "have formed close-knit relationships," the introduction of an undercover agent would not have been productive (*Id.* para. 91). These allegations satisfy the "practical and commonsense" test employed by the Fourth Circuit to the question of other methods. *Clerkley*, 556 F.2d at 714.

■ Finally, the defendants argue that the government failed to minimize irrelevant conversations as required by 18 U.S.C. § 2518(5). The Fourth Circuit has enunciated three factors to determine whether minimization efforts were "reasonable": the nature and scope of the enterprise, giving greater leeway for conspiracies; the government's expectation as to the content and parties to the conversation; and the degree of judicial supervision. *Clerkley*, 556 F.2d at 716. The defendants hired an ex-FBI agent to note failures to minimize, and he listed 104 cases of failed minimization, including personal calls of Parkin's secretary, calls from Parkin's tenants and real estate agents, and Parkin's financial adviser.

Applying the three *Clerkley* factors, the fact that this was a conspiracy investigation granted the agents more leeway than the ordinary case. *U.S. v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir.1987). They knew very little about who was involved when the taps began, and were forced to listen longer than usual to apparently social conversations since (as the Pierce affidavit explained) co-conspirators might be social

friends as well as business associates. The District Court reviewed their efforts weekly. Though statistics are by no means conclusive, they further support the conclusion that the government's efforts were reasonable: fully 80% of the 12,000 calls received were minimized, and only 33 nonpertinent calls were taped for five minutes or more.

More importantly, roughly half of the calls listed in the defendants' expert's affidavit as nonpertinent were minimized and spot-checked, and these efforts were recorded in written logs made available to the Court and the defense. The defendants' expert also listed calls that were clearly pertinent and should not have been minimized. There are unquestionably some errors, and the government admits that some calls should have been minimized that were not, but overall their efforts were reasonable and met the obligation imposed by § 2518(5).

*2. Wire fraud*

Counts 10–17 charge all defendants with wire fraud regarding the Teledyne procurement, and Counts 18–21 charge Berlin, Lackner and Parkin with further wire fraud regarding Hazeltine. The statute, 18 U.S.C. § 1343, forbids schemes or artifices "to defraud" as well as schemes to obtain money by fraudulent means. The indictment alleges that the defendants violated the first prong by fraudulently depriving other companies of the right to compete for the contract. All defendants move to dismiss these charges, arguing that the "other companies" had no property interest in the contract or the right to compete.

■ In *McNally v. U.S.*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that defendants can only commit wire fraud if they deprive a victim of some tangible property right, and not by depriving anyone of an intangible right to honest government. (Congress amended the statute in November, 1988 to overrule *McNally* and make intangible rights actionable, but that amendment cannot apply retroactively). The defendants argue that since no other company can be said to have a tangible property right in a

chance at a contract, the indictment does not charge an indictable offense.

The government's main argument in response is that the indictment does not charge deprivation of intangible rights, but deprivation of a contract, which is surely tangible property. This argument is specious: *McNally* did not reject only claims that charged deprivation of intangible rights in so many words, but required that an indictment allege a loss of tangible property. If the other unnamed companies had no property right in the contract, then the indictment's allegation is as faulty under *McNally* as an outright intangible rights claim would be.

It seems intuitively obvious that other companies, whoever they may be, have no cognizable property interest in the mere expectation of a contract that the government may award to any or none of them. If all the received bids were too high, in fact, the government would not have awarded the contract at all. All these hypothetical companies lost was the opportunity to compete on a level playing field for a chance at a property right. All of the government's cases were decided before *McNally*, and in that world the indictment would stand. *See, e.g., U.S. v. Venneri*, 736 F.2d 995, 996 (4th Cir.1984) (upholding mail fraud conviction of defendant who defrauded competitors of their right to unbiased bid competition). Since *McNally*, however, the Fourth Circuit has made it very clear that someone must have been defrauded of a traditional property right, *U.S. v. Mandel*, 862 F.2d 1067 (4th Cir. Dec. 7, 1988), and given this specific guidance the Court declines to follow the reasoning of *U.S. v. Telink, Inc.*, 681 F.Supp. 1454 (S.D.Cal.1988).

■ There is, however, another prong to § 1343, outlawing schemes to *obtain* money or property fraudulently. The defendants argue that even charges under this prong require some allegation in the indictment that a victim lost property, not just that the defendant obtained it. Whatever the merit of this view, the Court holds that the indictment sufficiently charges that the United States lost property. The indict-

ment alleges that the defendants devised a scheme "to obtain for TELEDYNE ELECTRONICS from the United States government the award of the AN/APM 424 contract, and the payments of money pursuant to that contract." The contract was clearly property, and the government was a victim with a traditional interest in it. Although the indictment alleges that the "obtaining" fraud "thereby" defrauded the other companies, the Court holds that the indictment alleges one scheme to violate both prongs of § 1343, and sufficiently indicates that the government was one intended victim. Therefore, the Court will dismiss the charge that the government deprived any other companies of property, but not the separate claim that the scheme defrauded the United States.

### 3. Motions to dismiss Counts 1, 26 & 27

All defendants move to dismiss Count 1, the conspiracy count, and Berlin and Parkin move to dismiss Counts 26 and 27 charging them with RICO violations. These motions are treated together because they turn on the number of conspiracies alleged in the indictment.

■ There are two complaints about Count 1. First, the defendants claim that it charges two separate crimes under 18 U.S.C. § 371: a conspiracy to defraud the United States and a conspiracy to commit offenses against the United States. The defendants rely most heavily on *dicta* from *U.S. v. Haga,* 821 F.2d 1036 (5th Cir.1987) that indictments may charge either prong of § 371 but not both. Many more cases have found that both prongs may be charged in one count. *See, e.g., May v. U.S.,* 175 F.2d 994 (D.C.Cir.1949); *U.S. v. Kernodle,* 367 F.Supp. 844 (M.D.N.C.1973). Courts have routinely held that a conspiracy count is not duplicitous if it charges one conspiracy to accomplish a number of illegal objectives. *See, e.g., U.S. v. Thomas,* 774 F.2d 807 (7th Cir.1985), *cert. denied sub nom. Troutman v. U.S.,* 475 U.S. 1024, 106 S.Ct. 1218, 89 L.Ed.2d 329 (1986). Count One in this case does no more than that.

■ The defendants also argue that Count One charges two conspiracies: one to acquire the AN/APM 424 contract for Teledyne and one to acquire the UPM ( ) contract for Hazeltine. That is, if Count One is viewed as a "wheel" conspiracy with Berlin, Lackner and Parkin at the hub and Teledyne and Hazeltine as spokes, there is no "rim" to connect the spokes because Teledyne and Hazeltine did not work together to pursue a single objective. Indeed, Hazeltine and Teledyne were nominal competitors. The overt acts alleged in Count One relate either to Teledyne or Hazeltine, with Berlin, Lackner and Parkin involved in both schemes, but no overt acts link the Teledyne defendants to Hazeltine.

There is no doubt that an indictment cannot charge two conspiracies in a single count. *Kotteakos v. U.S.,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). To constitute one conspiracy, there must have been "one overall agreement," *U.S. v. Bloch,* 696 F.2d 1213, 1215 (9th Cir.1982) to pursue a single objective. The determination rests on whether there is an "overlap of key actors, methods, and goals." *U.S. v. Leavis,* 853 F.2d 215 (4th Cir.1988).

The defendants rest their argument on three cases, factually somewhat analogous to this case, in which the court found multiple conspiracies where the schemes had certain actors in common, but there was no communication between the conspirators who were outside the hub. *U.S. v. Coward,* 630 F.2d 229 (4th Cir.1980) (two pharmacists who separately conspired with the same doctor to prescribe controlled substances); *U.S. v. Levine,* 546 F.2d 658 (5th Cir.1977) (separate agreements with hub defendant to produce obscene films); *U.S. v. Goss,* 329 F.2d 180 (4th Cir.1964) (various agreements with hub defendant to set up stills).

All three cases arose after the defendants were convicted of a single conspiracy, and the courts' ruling was based on the variance between the single conspiracy alleged in the indictment and the multiple conspiracies apparent from the proof at trial. Unlike those cases, the limited issue before the Court at this early stage is to

determine what the indictment charges as a matter of law. Thus, if the indictment as drawn would permit the government to prove a set of facts that would support a finding of one conspiracy, then the indictment is proper and the decision as to how many conspiracies existed is for the jury. *U.S. v. Urbanik*, 801 F.2d 692, 695–96 (4th Cir.1986).

Although this is a difficult issue, the Court concludes that the indictment does allege a single conspiracy. If the government presents evidence that Teledyne was conspiring with Parkin and knew that Parkin was also performing illegitimate services for Hazeltine relating to the UPM ( ) procurement, a reasonable jury might find that this connection supplied the "rim" between Teledyne and Hazeltine that a conspiracy charge requires.

The Fourth Circuit's recent decision in *U.S. v. Leavis*, 853 F.2d 215 (4th Cir.1988) supports this conclusion. A number of defendants conspired to import drugs in 1985. After that operation was completed, in the spring of 1986, Leavis agreed to pilot a plane importing more drugs. This second plan was broken up by federal agents. At Leavis' trial, the court permitted the government to introduce evidence relating solely to the 1985 plan against Leavis. The Fourth Circuit rejected Leavis' claims that the 1985 and 1986 plans were separate conspiracies, noting that the main actors were the same in both arrangements, and that the methods and goals were the same. Likewise, here all alleged conspirators were the same except Teledyne and Hazeltine, the methods were identical, and the goals were the same: to influence the procurement process relating to Identification Friend or Foe (IFF) equipment. If the government can prove that Teledyne knew of Hazeltine's activities with Parkin, a reasonable jury might find a single conspiracy. The indictment therefore alleges a single conspiracy, and that ruling will be the law of the case through trial.

■ That ruling on Count One, and the Fourth Circuit's strict interpretation of the RICO "pattern" requirement, require that the RICO counts (26 & 27) be dismissed.

Whether criminal activity constitutes a RICO pattern is "a matter of criminal dimension and degree." *International Data Bank v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987). Not every two "racketeering acts" constitute a RICO pattern in the Fourth Circuit; the essence of the pattern requirement is the presence of an extensive criminal enterprise that deserves the heightened criminal penalties "reserved for schemes whose scope and persistence set them above the routine." *HMK Corp. v. Walsey*, 828 F.2d 1071 (4th Cir.1987). To impose RICO liability, the government must allege more than a garden-variety fraud or bribery case; it must allege a "continuity" to the enterprise involving "more extended periods of time [and] almost inevitably ... different victims." *Walk v. B & O Railroad*, 847 F.2d 1100 (4th Cir.1988). The alleged racketeering acts must be related, but they must also indicate a continuous, entrenched criminal enterprise. That element is noticeably absent in this case.

In its most recent discussion of the requirement, *Walk*, 847 F.2d at 1106, the Fourth Circuit was careful to point out that the government need not prove two "schemes." For example, if a group of defendants repeatedly robbed banks, the Court would not allow them to avoid RICO liability by labeling it one conspiracy "to rob banks." However, the holding of *Walk* is more instructive than its dicta. There, the predicate acts spanned ten years, and involved four of what the government here would call "sub-schemes." Yet, just as in the four-year zoning dispute in *Walsey* and the ongoing securities scheme in *Zepkin*, the Fourth Circuit held that all actions over the decade were designed to achieve a single goal—getting rid of minority interests in the B & O. Similarly, the Court has held that Count One of the indictment charges a single conspiracy with, as the government agrees, "one overall goal"—to influence the procurement process for IFF equipment.

The alleged pattern in this case pales in comparison to the above three cases, particularly *Walk*. Here the entire alleged

scheme lasted fifteen months, a very short time considering the normal length of the complex defense procurement process. *Cf. Walsey*, 828 F.2d at 1074–75 (given the "complexity of political processes in general," "neither the number of predicate acts nor the span of time [four years] elevates the alleged scheme in this case to a pattern of racketeering activity under RICO"). The two alleged predicate acts here appear to be not an indication that Berlin, Lackner and Parkin were involved in an entrenched, ongoing criminal enterprise, but rather two isolated schemes of bribery and wire fraud adequately addressed by the other counts of the indictment. Because this case does not present the special circumstances that the "pattern" requirement demands, the RICO counts must be dismissed.

## II. Individual Motions

### 1. *Berlin's motions to suppress*

Berlin moves to suppress a statement that he gave to FBI and Naval Investigative Service (NIS) agents when they spoke to him on June 14, 1988, the fruits of a search of his wallet, and materials seized that were allegedly beyond the scope of the search warrant.

Having considered the testimony at the evidentiary hearing on February 24, 1989, the Court finds that on June 14, 1988, an FBI agent and an NIS agent executed a search warrant on Berlin's office. The warrant clearly extended only to the office, and not to Berlin personally. When the agents arrived, Berlin was in his office. Berlin consented to an interview, and sat down with the agents at Berlin's conference table. Berlin acknowledged that he knew Fred Lackner. The agents then played two tape recorded conversations between Berlin and Lackner, and the interview ended as Berlin requested an attorney. The agents produced their search warrant and used Berlin's telephone to contact the search team that was waiting downstairs.

Berlin testified that while waiting for the search team he took his wallet out of his back pants pocket to transfer it to his jacket, which was on a coat rack. The agents testified that the wallet was on the desk, and Berlin picked it up. The agents searched the wallet, removed several papers, and returned it. Berlin left and the agents searched the office, seizing various items.

Berlin raises three objections. First, he claims he should have been given *Miranda* warnings before the "interview." Second, he argues that since his wallet never left his person it was outside the scope of the search warrant. Third, in searching the office the agents seized documents relating to the UPM ( ) procurement, though the warrant only covered AN/APM–424, UPM–150, and TACAN.

■ *Miranda* warnings turn on whether the interrogation was "custodial," and the Fourth Circuit has interpreted this requirement rigorously. In *U.S. v. Jones*, 818 F.2d 1119 (4th Cir.1987), the Court reversed a finding that *Miranda* was violated where suspects accompanied police to the station where they were questioned for an hour. Here, the interview took place in Berlin's office and lasted about forty minutes. The agents never told Berlin he could not leave, and Berlin apparently realized he was not under arrest: after the interview he asked the agents whether he would be arrested. This interrogation was not custodial, and the motion to suppress Berlin's statement is therefore DENIED.

■ As to the search of the wallet, the Court finds as a fact based on the credibility of the witnesses that the wallet was on the desk. It was therefore within the scope of the warrant authorizing a search of Berlin's office, and this motion to suppress is DENIED.

■ Finally, the warrant authorized seizure of documents relating to defendants Lackner and Parkin and the AN/APM–424, UPM–150, and TACAN procurements, but not the UPM ( ). Apparently, the only item in question is a spiral notebook that contained notes on both TACAN and the UPM ( ). Although notes regarding the TACAN procurement are clearly within the four corners of the warrant, the UPM ( ) notes are not. Moreover, the agents' seizure of the entire notebook does not permit the

government to use the UPM ( ) notes under the good faith exception. That rule merely permits officers to rely on a facially valid warrant that is later declared invalid, *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which is not the case here: the warrant was valid but the agents went beyond its plain terms. Even under the good faith exception officers must limit their seizure to the face of the warrant. While it may have been reasonable at the time for the agents to seize the entire notebook rather than rip out the irrelevant pages, the government is not entitled to introduce evidence clearly beyond the scope of the warrant simply because it happens to be connected with legitimate material. Berlin's motion to suppress the UPM ( ) notes is therefore GRANTED.

## 2. The Teledyne defendants' motion for severance

■ The Teledyne defendants (Teledyne Inc., George Kaub, Eugene Sullivan, and Dale Schnittjer) move to sever their trial from that of Berlin, Lackner and Parkin on three grounds. First, evidence relating to the UPM ( ) and Hazeltine, which is valid against the three individuals, is not at all relevant as to the Teledyne defendants. Second, "other crimes" evidence that comes in against the individuals might taint Teledyne. Third, if a lot of co-conspirator evidence is offered, they argue, even limiting instructions will not be sufficient to cure the taint.

Rule 8(b) permits joinder only where the defendants have participated in the same series of acts or transactions constituting an offense. The Fourth Circuit has insisted on severance in cases not unlike this one. For example, in *U.S. v. Chinchic*, 655 F.2d 547, 550–51 (4th Cir.1981), the court reversed a joint trial where there were two burglaries, and some of the defendants had participated in both but others, like the Teledyne defendants here, had participated in only one. However, the Court's holding that the indictment alleges a single conspiracy removes the need for separate trials. Also, dismissal of the RICO counts reduces the danger that evidence of "racketeering" might prejudice the Teledyne defendants,

and suggests that there will be much less evidence regarding Hazeltine and the UPM ( ) procurement except to establish the conspiracy in Count One. Co-conspirators are routinely tried together, even when individuals are not alleged to have participated in all of the overt acts. *See, e.g., Leavis*, 853 F.2d at 218. The Teledyne defendants' motion for severance is therefore DENIED.

## 3. Parkin's motion to dismiss Count 23

■ Count 23 charges Lackner and Parkin with receipt of U.S. property with intent to convert it, namely confidential information about Gould Inc.'s bid on the UPM ( ) contract in competition with Hazeltine. Parkin argues that confidential bid information is not government property, and he therefore cannot be convicted for converting it.

Courts have uniformly held that defendants may be indicted under § 641 for theft of information belonging to the government. *See, e.g., U.S. v. Girard*, 601 F.2d 69 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *U.S. v. Morison*, 604 F.Supp. 655 (D.Md.), *appeal dismissed*, 774 F.2d 1156 (4th Cir.1985). The only issue, then, is whether the government had a sufficient interest in the bid information to constitute property under § 641. The government need not have title to the property, but merely exercise "supervision and control" over it. *See, e.g., U.S. v. Benefield*, 721 F.2d 128, 129 (4th Cir.1983); *U.S. v. Evans*, 572 F.2d 455, 472 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

Parkin argues principally that the information was *exclusively* Gould's property. All cases upholding § 641 convictions for theft of information concerned information that was generated by the government and therefore clearly its property. Apparently there have been no cases involving information generated by a private party and submitted to the government temporarily. However, cases involving tangible property provide some guidance. For example, in *Benefield*, the government temporarily held money paid by patrons of a Non–Commissioned Officers' Club as tips before dis-

tributing it to Club employees. The Fourth Circuit held that temporary custody sufficient to permit prosecution of an employee under § 641 who converted the tip money to her own use. Similarly, in *U.S. v. Perez*, 707 F.2d 359 (8th Cir.1983), the Court found a sufficient property interest in $1,500 in currency that was marked as a trial exhibit. The money was not subject to forfeiture and thus title could never pass to the government, but the government's control over the money for the duration of the trial was sufficient.

In this case, the Federal Acquisition Regulations governing bid information charge the government with keeping bid information secure and confidential until it is publicly disclosed. Undoubtedly, Gould retained a property interest in the information and could have released it to the public at any time. However, as the temporary custody cases indicate, the statute does not require that the government hold the sole interest in the property, and the Court holds that the government had sufficient custody to prosecute someone who essentially stole information that was in government custody.

*4. Government's motion regarding admissibility of wiretaps*

The government has moved for a pretrial ruling that adequate foundation exists to admit certain wiretap tapes at trial. The parties have agreed to an evidentiary hearing to resolve this issue, and the Court postpones its ruling on the motion until that hearing.

*5. Motion for Pretrial Hearing on Admissibility of Co–Conspirators' Statements*

 Berlin and the Teledyne defendants move for a pretrial hearing to determine whether the conspiracy charged in Count 1 and the RICO counts existed and whether Berlin and Teledyne were members of that conspiracy. If they were, then statements that would ordinarily be hearsay would come in as statements of co-conspirators under Fed.R.Evid. 801(d)(2)(E).

Some circuits have explicitly required such a pretrial hearing, but the Fourth Circuit has considered and rejected this method of handling the problem. *U.S. v. Hines*, 717 F.2d 1481 (4th Cir.), *cert. denied*, 467 U.S. 1214, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). The Fourth Circuit prefers that the District Court allow the statements in, and if the statements are later determined to be inadmissible because the government fails to establish the conspiracy, the District Court can either grant a mistrial or give a limiting instruction. In determining whether the government's proof is sufficient, the Court can rely on all the evidence presented, including the challenged statements of co-conspirators. *Bourjaily v. U.S.*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Particularly now that the RICO counts have been dismissed and the Court has ruled that one conspiracy existed, the Court sees little need for such a pretrial hearing, and this motion is DENIED.