**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**ARCH TRADING COMPANY,**
**Defendant–Appellant.**

**No. 92–5098.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1992.

Decided Feb. 26, 1993.

William Joseph Hardy, Kleinfeld, Kaplan & Becker, argued, Washington, DC, for defendant-appellant.

John Patrick Rowley, III, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, argued (Richard Cullen, U.S. Atty., Office of the U.S. Atty.; Alexandria, VA, on brief), for plaintiff-appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

NIEMEYER, Circuit Judge:

On August 2, 1990, Iraq invaded Kuwait. On that same day President Bush invoked the emergency powers provided to him by Congress and issued executive orders prohibiting United States persons from, among other things, traveling to Iraq and dealing with the government of Iraq and its agents. In the present appeal, Arch Trading Company, Inc., a Virginia corporation, challenges its convictions for various crimes arising from violations of these prohibitions. The company was convicted of conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371; of disobeying the emergency executive orders, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, and of lying to the Department of Treasury's Office of Foreign Assets Control (OFAC) about its conduct, in violation of 18 U.S.C. § 1001. It was sentenced to a fine of $50,000.

Arch Trading contends principally that (1) the indictment charging it with conspiracy to *commit an offense* under § 371 was defective because in the circumstances the company could only have been charged with conspiracy *to defraud;* and (2) the IEEPA (under which the President issued the executive orders) impermissibly delegated to the Executive Branch legislative authority to create crimes, is unconstitutionally vague, and was applied to Arch Trading *ex post facto* because implementing regulations were published only after the illegal conduct occurred. Arch Trading also challenges a search and seizure related to these convictions and the applicability of 18 U.S.C. § 1001, the statute prohibiting

lying to an agency of the United States. After carefully considering each of Arch Trading's arguments, we affirm.

I

In November 1988 Arch Trading entered into a $1.9 million contract with Agricultural Supplies Company, a "quasi-governmental body owned by the government of Iraq" (Agricultural of Iraq), to ship to Iraq and install there laboratory equipment, including a "virology fermenter" and a "bacteriology machine," purportedly for veterinary use. Payment by Agricultural of Iraq to Arch Trading was assured by a $2 million irrevocable letter of credit issued by Rafidain Bank of Iraq and performance by Arch Trading was guaranteed by a letter of credit issued by the Commercial Bank of Kuwait. To secure that letter of credit, Arch Trading was required to deposit $200,000 with the Kuwaiti bank.

From April 1990 through July 1990 Arch Trading acquired the equipment and related chemicals and arranged for their delivery to Iraq. By early August 1990, five of a planned six shipments had arrived in Iraq, but none had been installed. The sixth shipment, which was never actually delivered, was en route. On August 2, 1990, when Iraq invaded Kuwait, President Bush, invoking the powers given him under the IEEPA, issued Executive Order No. 12722, 55 Fed.Reg. 31,803 (1990), prohibiting United States persons from, among other things, exporting goods, technology, or services to Iraq; performing any contract in support of an industrial, commercial or governmental project in Iraq; and engaging in any transaction related to travel to Iraq by United States persons. At Arch Trading's request, that same day the Treasury Department's OFAC faxed a copy of the Executive Order to Arch Trading's offices. A week later the President issued a slightly more detailed order, Executive Order No. 12724, 55 Fed.Reg. 33,089 (1990). Both executive orders were formally implemented through regulations published in the Code of Federal Regulations, 31 C.F.R., Pt. 575.

Notwithstanding the prohibitions of the first executive order, two executives of Arch Trading immediately attempted to enter Iraq via Cyprus to install the laboratory equipment that had already been delivered. When that effort failed, Arch Trading retained a Jordanian firm, Biomedical Technologies, Inc., to perform the installation. One of the Arch Trading executives who had earlier attempted to enter Iraq later joined Biomedical employees in Baghdad to help coordinate the installation, which was accomplished between October 24 and November 2, 1990. The travel expenses of both the Arch Trading executive and the Biomedical Technologies employees were reimbursed by Arch Trading, on authority of its president, Kamal Sadder, and upon completion of the installation, Biomedical Technologies was paid a bonus.

Arch Trading then sought to recover the $200,000 which had been deposited with the Kuwaiti bank to secure the letter of credit guaranteeing contractual performance, submitting backdated documents which falsely represented that contractual performance was completed on July 24, 1990, before the embargo of August 2 was imposed. Arch Trading also asked Biomedical Technologies to backdate its confirmation of performance. The Kuwaiti bank nevertheless denied the request for return of the funds "until [Arch Trading] obtain[ed] a license from the Office of Foreign Assets Control of the Department of the Treasury (OFAC)." To obtain the license, Arch Trading wrote a letter, dated April 3, 1991, to the Treasury Department's OFAC explaining the company's position. The letter stated: "We have performed our contract *prior to August 2d, 1991* [1990], and stopped any contact with Iraq in conformity with the presidential executive [order]." Noting that the Kuwaiti bank said it required a license before the $200,000 deposit could be released, the letter concluded, "At this time we would like your office to inform us if such license is necessary for the release of our funds. *If so, kindly issue us this license at the earliest possible time.*" (Emphasis added). The OFAC replied by letter, erroneously

advising Arch Trading that no license was required.

Arch Trading's dealings with Iraq ultimately came to the attention of the United States Customs Service during an investigation into a shipment unrelated to this case. In late July 1990, customs agents discovered a personal computer at Dulles International Airport in Washington, D.C., that Arch Trading was shipping to Baghdad, Iraq, without proper documentation. During the course of the investigation the government questioned Arch Trading executives and subsequently executed a search warrant which led to the indictment and conviction in this case. This appeal followed.

## II

■ Arch Trading first contends that it was improperly charged under 18 U.S.C. § 371. That section criminalizes conspiracies of two sorts: conspiracies *to commit an offense* against the United States and conspiracies *to defraud* the United States.[1] Arch Trading was charged with, and convicted of, conspiring to commit an "offense" against the United States government. It asserts, however, it could only have been charged, if at all, with having conspired to "defraud" the United States, because violations of executive orders and regulations do not constitute an "offense." Arch Trading argues that the conspiracy count must therefore be dismissed, relying on *United States v. Minarik*, 875 F.2d 1186, 1193–94 (6th Cir.1989).

We reject this argument because we do not agree that violation of an executive order cannot constitute an offense as that term is used in 18 U.S.C. § 371. While it

may be that executive orders cannot alone establish crimes, when such orders are duly authorized by an act of Congress and Congress specifies a criminal sanction for their violation, the consequence is different. In this case the IEEPA authorized the President to issue executive orders proscribing conduct, and 50 U.S.C. § 1705(b) makes criminal the disobedience of an order issued under the Act.[2] There is no question that violation of a federal criminal statute may properly be charged under the "offense" clause. *See United States v. Feola*, 420 U.S. 671, 687, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975). We therefore hold that when Congress provides criminal sanctions for violations of executive orders that it empowers the President to issue, such violation constitutes an "offense" for the purposes of 18 U.S.C. § 371.

■ While Arch Trading's conduct could arguably have been charged also as a conspiracy "to defraud," the two prongs of § 371 are not mutually exclusive. Because of the broad interpretation which has been given the "defraud" clause, § 371's two clauses overlap considerably. The wide breadth of the "defraud" clause has long been established:

> To conspire to defraud the United States means to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official actions and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those

---

**1.** Section 371 provides:

If two or more persons conspire either [1] to commit any offense against the United States, or [2] to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such

conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**2.** 50 U.S.C. § 1705(b) provides:

Whoever willfully violates any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,-000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

charged with carrying out the governmental intention.

*Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

Because of this overlap, given conduct may be proscribed by both of the section's clauses. In such a situation, the fact that a particular course of conduct is chargeable under one clause does not render it immune from prosecution under the other. When both prongs of § 371 apply to the conduct with which a particular defendant is charged, the government enjoys considerable latitude in deciding how to proceed. *See United States v. Jones,* 976 F.2d 176, 183 (4th Cir.1992) ("[F]aced with two equally applicable penal statutes, there is nothing wrong with the government's decision [absent an improper purpose] to prosecute under one and not the other"). Convictions under the "defraud" clause for conspiracies *to commit particular offenses* are commonly upheld. *See, e.g., Dennis v. United States,* 384 U.S. 855, 862–64, 86 S.Ct. 1840, 1845–46, 16 L.Ed.2d 973 (1966); *United States v. Mohney,* 949 F.2d 899, 902–03 (6th Cir.1991); *United States v. Sans,* 731 F.2d 1521, 1533–34 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). Conversely, convictions under the "offense" clause for conspiracy to engage in conduct which would defraud the United States are also proper. *See Minarik,* 875 F.2d at 1193–96. Many courts have even found it permissible to list both prongs of § 371 in a single indictment count rather than specifying whether the alleged conspiracy was one to defraud or one to commit an offense. *See, e.g., United States v. Bilzerian,* 926 F.2d 1285, 1301–02 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Smith,* 891 F.2d 703, 711–13 (9th Cir.1989), *amended* 906 F.2d 385 (1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *May v. United States,* 175 F.2d 994 (D.C.Cir.), *cert. denied,* 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949); *United States v. Berlin,* 707 F.Supp. 832 (E.D.Va.1989). *But see United States v. Haga,* 821 F.2d 1036 (5th Cir. 1987) (holding indictment count may charge

violation of either prong of § 371 but not both).

The case upon which Arch Trading primarily relies, *United States v. Minarik,* is in no way inconsistent with our conclusions. In *Minarik,* the Sixth Circuit found that the prosecution had "used the defraud clause in a way that created great confusion about the conduct claimed to be illegal." *Minarik,* 875 F.2d at 1196. In light of the prejudice to the defendant that resulted from the confusion in that case, the Sixth Circuit reversed the defendant's conviction. *Id.* at 1186, 1193–96. As that court has since stressed, however, *Minarik* did not hold that the two clauses of § 371 are mutually exclusive, but only that in the case then before the court confusion prejudicial to the defendant had arisen from the government's choice of proceeding under the "defraud" clause. *See Mohney,* 949 F.2d at 902–03; *cf. Bridges v. United States,* 346 U.S. 209, 223–34, 73 S.Ct. 1055, 1063, 97 L.Ed. 1557 (1953) (government may not invoke "defraud" clause in order to evade time bar applicable under "offense" clause). In cases such as the present one, however, where the defense will not be unfairly burdened by invocation of either clause, the prosecution may frame the indictment at its discretion.

In short, the evidence in this case against Arch Trading would have supported conviction under either the "offense" or the "defraud" clause, and absent an improper motive, which is not alleged here, the government's choice of invoking the offense clause was an appropriate exercise of discretion.

### III

■ Arch Trading next challenges its conviction for violating the IEEPA, contending that (1) the IEEPA impermissibly delegates to the executive branch legislative authority to create crimes, by authorizing the President to define criminal conduct by executive order, *cf.* U.S. Const. art. I, § 1 (vesting legislative power in Congress); (2) its conviction rests upon executive orders which were inconsistent and therefore

void for vagueness; and (3) enforcement of regulations adopted after Arch Trading's conduct occurred violates the *Ex Post Facto* Clause, *see* U.S. Const. art. I, § 9, cl. 3.

While it is recognized that an unconstrained delegation by Congress of authority to define criminal conduct would run afoul of the constitutionally-based nondelegation doctrine, *see Mistretta v. United States*, 488 U.S. 361, 371–74, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989), a challenge to a specific Congressional grant of authority to define only the details of criminal conduct presents a more complex question. In the context of the IEEPA, the Supreme Court has upheld Congress' delegation to the President of civil authority to nullify certain attachments and transfers of assets. *See Dames & Moore v. Regan*, 453 U.S. 654, 675, 101 S.Ct. 2972, 2984, 69 L.Ed.2d 918 (1981). Arch Trading contends, however, that the IEEPA's delegation of the power to define criminal conduct is inherently different from, and more suspect than, the Act's civil provisions.

The Supreme Court most recently articulated the limits of a lawful delegation of the power to define criminal conduct in *Touby v. United States*, ___ U.S. ___, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Upholding the delegation of authority to the Attorney General to specify the particular substances, possession of which violate the criminal law, the Court stated:

> So long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." ... Petitioners suggest, however, that something more than an "intelligible principle" is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions. They contend that regulations of this sort pose a heightened risk to individual liberty and that Congress must therefore provide more specific guidance. Our cases are not entirely clear as to whether or not more specific guidance is in fact required. We need not resolve that issue today. We conclude that § 201(h) passes

muster even if greater congressional specificity is required in the criminal context.

*Id.* at ___, 111 S.Ct. at 1756. In *Touby*, the factor which marked the statute as unquestionably constitutional was that it "meaningfully constrain[ed] the Attorney General's discretion to define criminal conduct." *Id.* It did so by (1) specifying that scheduling the substance in question must be determined to be "necessary to avoid an imminent hazard to the public safety" before the Attorney General could take action; (2) specifying the factors that go into such a determination; (3) requiring published 30–day notice of the proposed scheduling and consideration of any comments from the Secretary of Health and Human Services; and (4) requiring that certain findings be made as to the effects of the substance in question (e.g., for adding a substance to schedule I, that the substance had no medical value and had a high potential for being abused). *Id.* at ___, 111 S.Ct. at 1756–57.

Similar constraining factors are present here. The IEEPA, which was drawn from and constitutes an extension to the Trading with the Enemy Act of 1917, 50 U.S.C.App. § 1, *et seq.*, defines the specific circumstances in which the President may act and to what extent. The President's authority is limited to meeting a foreign threat "to the national security, foreign policy or economy of the United States," that is "unusual and extraordinary," and only then if he is able to declare the threat a "national emergency" under the National Emergencies Act, 50 U.S.C. § 1601, *et seq. See* 50 U.S.C. § 1701. He is required to consult with Congress *before*, if possible, exercising the powers conferred, to explain his acts in specified respects, and to report regularly thereafter during the period of the emergency. *See* 50 U.S.C. § 1703. The powers granted to the President are explicitly defined and circumscribed. *See* 50 U.S.C. § 1702. Moreover, the Act protects the conduct of any person whose violation of the President's order can be shown to be "in good faith." 50 U.S.C. § 1702(a)(3).

Combined with the two factors relied upon in *Dames & Moore*—the President's special powers to make determinations regarding foreign policy and Congressional acceptance of the President's actions—these provisions of the IEEPA limiting the President's authority to define criminal conduct firmly establish that the Act meets the standard of constraint applied in *Touby*. Because the IEEPA meets this standard, we need not decide the unsettled question of whether delegation of the authority to define criminalized conduct must be held to a higher standard than delegation of civil authority.

■ Arch Trading also contends that the standard for violation of the sanctions against Iraq changed as the second executive order and the regulations were issued, and that this purported change made the executive orders and implementing regulations void for vagueness. It makes special note of the provision of the second executive order (dated August 9, 1990), that it superseded the first to the extent that the two were *"incompatible."*

Even a cursory examination of the two executive orders, however, makes clear that the standard relevant to judgment of Arch Trading's acts did not in fact change. The first executive order specified that United States persons were prohibited from traveling to Iraq, exporting any goods to Iraq, and performing a contract in support of an industrial, commercial, or governmental project in Iraq. The second order prohibited the same conduct. While it did

provide greater detail, that detail is not material to Arch Trading's conduct.[3] Further, what was prohibited was laid out at such a level of detail in the original Executive Order, of which Arch Trading had *actual* (not just constructive) notice, that Arch Trading was undoubtedly aware of the illegality of its actions. This awareness is confirmed by its considered efforts to circumvent the order's prohibitions and to conceal its actions: Arch Trading attempted to send representatives to Iraq via Cyprus after receiving notice of the prohibition; it backdated financial documentation and requested a Jordanian subcontractor to do the same; and it falsely represented to the Department of the Treasury that it had performed its contract before August 2, 1990, and had as of that date "stopped any contact with Iraq." The executive orders that Arch Trading violated were written in a manner that did not encourage arbitrary and discriminatory enforcement, and they defined the prohibited conduct with sufficient definiteness that an ordinary person could—and in this case did—understand what conduct was prohibited. They were, therefore, not void for vagueness. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

■ Arch Trading contends finally that the criminal sanctions for violating the IEEPA are unenforceable under the *Ex Post Facto* Clause because regulations implementing the executive orders allegedly

**3.** Executive Order No. 12722, issued on August 2, 1990, prohibited in pertinent part:

[t]he export to Iraq of any goods, technology ... or services from the United States; ... [t]he performance by any United States person of any contract in support of an industrial or other commercial or governmental project in Iraq; ... [a]ny transaction by a United States person relating to travel by any United States citizen or permanent resident to Iraq, or to activities by any such person ...; and [a]ny transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order."

Similarly, Executive Order No. 12724, issued on August 9, 1990, prohibited in pertinent part:

[t]he exportation to Iraq, or to any entity operated from Iraq, or owned or controlled

by the Government of Iraq, directly or indirectly, of any goods, technology (including technical data or other information), or services ... from the United States ... or any act that promotes or is intended to promote such exportation ...[;] Any transaction by a United States Person relating to travel by any United States citizen or permanent resident alien to Iraq, or to activities by any such person within Iraq, after the date of this order ...[;] [t]he performance by any United States person of any contract ... in support of an industrial, commercial, public utility, or governmental project in Iraq; ... [and] [a]ny transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this order.

These executive orders are reprinted in full at 50 U.S.C. § 1701.

were adopted after the prohibited conduct took place. *See* Part 575 of Title 31 of the Code of Federal Regulations. This argument fails because Arch Trading's conviction did not result from violation of those regulations. While the indictment against Arch Trading mentions the regulations promulgated to enforce Executive Orders No. 12722 and No. 12724, as well as the executive orders themselves, the regulations in question are, in all relevant respects, indistinguishable from the executive orders they supplement. Arch Trading was not charged with any action that would have violated the regulations but not the underlying executive orders. It cannot, therefore, have been prejudiced by the indictment's allusion to the regulations.

## IV

■ Arch Trading also challenges its conviction under 18 U.S.C. § 1001 for making a false statement to the Treasury Department's OFAC when applying for a license for release of the $200,000 deposit at the Kuwaiti bank. It contends that its misrepresentation did not influence any governmental decision because the OFAC's only response was to state that no license was necessary. Moreover, Arch Trading contends that the OFAC did not have jurisdiction to issue a license, rendering § 1001 inapplicable to any application for the license.

Section 1001 reads:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully ... makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

■ To establish a violation of § 1001, it must be proved that (1) the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false, (2) the defendant acted "knowingly or willful-

ly," and (3) the false statement or concealed fact was material to a matter within the jurisdiction of the agency. *See United States v. Seay,* 718 F.2d 1279, 1284 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984). A material fact about a matter within the jurisdiction of the agency is one that has a "natural tendency to influence agency action or is capable of influencing agency action." *United States v. Norris,* 749 F.2d 1116, 1122 (4th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985).

■ While it may be a fact that Arch Trading's misrepresentations did not prompt any official action, the prompting of such action is not an element of a § 1001 offense. As we have stated previously, "[T]here is no requirement that the false statement [actually] influence or effect the decision making process of a department of the United States government." *Norris,* 749 F.2d at 1121. Moreover, the OFAC's determination that a license was not necessary turned out to be erroneous. Because the Iraqi government had a contingent interest in the Kuwaiti bank's letter of credit, which the $200,000 deposit secured, it was necessary for Arch Trading to obtain a license to have that deposit released. This licensing requirement continued through April 1991, when the misrepresentation was made. *See* 31 C.F.R. § 575.201.

■ Arch Trading also claims, relying on its other § 1001 arguments, that the determination that Arch Trading's misrepresentation was material was tainted by inadequate instructions to the jury on the question of materiality. In the context of § 1001, however, we have consistently held that "materiality is a question of law to be determined by the trial judge." *See Norris,* 749 F.2d at 1121; *accord Nilson Van & Storage Co. v. Marsh,* 755 F.2d 362, 367 (4th Cir.1985); *United States v. Ivey,* 322 F.2d 523, 529 (4th Cir.), *cert. denied,* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963). There was, therefore, no reversible error in failing to clarify that issue for the jury.

## V

■ Finally, Arch Trading contends that evidence used against it at trial was

obtained by an illegal search in violation of the corporation's Fourth Amendment rights because the search warrant, which was issued by a magistrate judge, was not supported by probable cause. We do not agree.

The facts before the magistrate judge showed that an investigation of Arch Trading was prompted by the discovery that at the time the embargo was imposed Arch Trading had been attempting to ship a personal computer from Dulles International Airport in Washington, D.C. to Baghdad, Iraq, without proper documentation. During the investigation, customs officials interviewed Arch Trading's vice president, who represented that Arch Trading's only business to date consisted of the computer sale in question, a May 1990 shipment to Iraq from Sweden (valued at $71,432), and a shipment to Iraq from Germany canceled because of the embargo. It failed to disclose any of the shipments under the $1.9 million contract with Agricultural of Iraq. When customs officials searched Arch Trading's garbage, however, they found evidence of Arch Trading's ownership of shipments to Agricultural of Iraq and its attempt to reroute the sixth shipment under the contract to Lebanon.

With these facts in hand, we believe that the magistrate judge had a substantial basis for concluding that it was fairly probable that a search of Arch Trading's corporate offices would reveal evidence that it was engaged in the performance of a commercial contract with the government of Iraq in violation of the IEEPA. The warrant was, thus, properly issued and the search constitutional. *See Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

## VI

Finding no reversible error, we affirm the judgment of the district court.

*AFFIRMED.*