**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2028**

JOSE NEFTALY CANALES GRANADOS,

       Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

       Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 23, 2021              Decided: November 4, 2021

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

Petition for review denied by published opinion. Judge Wilkinson wrote the opinion in which Judge Niemeyer and Judge Agee joined.

**ARGUED:** Samantha Hsieh, CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION, Washington, D.C., for Petitioner. Allison Frayer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Brian Boynton, Acting Assistant Attorney General, Jessica A. Dawgert, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WILKINSON, Circuit Judge:

Jose Neftaly Canales Granados, a citizen of El Salvador, challenges an order of removal based on his conviction for two crimes involving moral turpitude (CIMTs). At issue is whether the phrase "crime involving moral turpitude" is either unconstitutionally vague or violative of the nondelegation doctrine, and whether Virginia's felony eluding statute, Va. Code § 46.2-817(B), qualifies as such an offense. For the reasons that follow, we conclude that the CIMT definition does not violate the Constitution and that Virginia felony eluding constitutes a CIMT.

I.

Canales Granados was born in El Salvador but was admitted to the United States as a lawful permanent resident in March 2001. In 2018, he was convicted of a series of criminal offenses, which he attributes to a multi-year struggle with substance abuse. On February 5, 2018, he pleaded guilty to Virginia petit larceny, and on July 31, 2018, he pleaded guilty to Virginia felony eluding, felony hit and run, and driving under the influence. For the latter three convictions, he was sentenced to 15 years and 60 days in prison. All but five days of the sentence were suspended, and he was instead sentenced to a residential addiction treatment program.

Following his criminal detention, Immigration & Customs Enforcement transferred Canales Granados to the Farmville Detention Facility in Virginia. The Department of Homeland Security issued him a Notice to Appear. The Notice charged him with removability under 8 U.S.C. § 1227(a)(2)(A)(ii) because he was an alien convicted of two

or more CIMTs not arising out of a single scheme of criminal misconduct. The crimes at issue were his Virginia petit larceny, felony eluding, and felony hit-and-run convictions.

Canales Granados moved to terminate the removal proceedings. While he conceded that his petit larceny conviction was a CIMT, he contended that neither Virginia felony hit and run nor Virginia felony eluding qualified. On July 31, 2019, the immigration judge (IJ) denied his motion. The IJ agreed with Canales Granados that the hit and run conviction was not a CIMT. However, the IJ determined that felony eluding was. That conviction, when combined with Canales Granados' petit larceny conviction, gave him two CIMTs, rendering him removable. He appealed to the BIA, which upheld the IJ's determination.

Canales Granados timely petitioned this court for review of the BIA's decision, and we granted a stay of removal pending our review.

II.

We first address Canales Granados' contention that the CIMT definition is unconstitutionally vague. It is unremarkable to note that utter precision in statutory language is impossible. A law is therefore only unconstitutionally vague in contravention of the Due Process Clause if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The CIMT definition clears this constitutional hurdle.

The statute at issue, 8 U.S.C. § 1227(a)(2)(A)(ii), provides that aliens convicted of two or more "crimes involving moral turpitude" not arising from a single scheme are deportable. CIMTs have "two essential elements: a culpable mental state and reprehensible conduct." *Sotnikau v. Lynch*, 846 F.3d 731, 736 (4th Cir. 2017). A culpable mental state

3

requires criminal recklessness, while reprehensible conduct must "independently violate[] a moral norm" and "shock[] the public conscience as being inherently base, vile, or depraved." *Id.* at 735–36. Of course, individuals concerned by this definition can avoid any vagueness problem by ensuring their conduct remains squarely on the right side of the legal line. Because the CIMT definition provides "ordinary people fair notice of the conduct it" encompasses, both the Supreme Court and Fourth Circuit have made clear that the CIMT definition passes constitutional muster.

In *Jordan v. De George*, 341 U.S. 223, 231 n.15 (1951), the Supreme Court held that "[t]he phrase 'crime involving moral turpitude' presents no greater uncertainty or difficulty than language found in many other statutes repeatedly sanctioned by [this] Court." The Court upheld a deportation warrant based on two fraud convictions, concluding that the CIMT definition provided "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Id.* at 231–32. And in *Boggala v. Sessions*, 866 F.3d 563, 564 (4th Cir. 2017), this court read *De George* to uphold an order of removal based upon a conviction for soliciting a child by computer to commit a sex act. We found "no reason to depart" from *De George*'s "general pronouncement" sanctioning the CIMT definition. *Id.* at 570.

*De George* and *Boggala* were not, as Canales Granados argues, implicitly overruled by *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). The latter two cases found specific provisions seeking to define violent crimes—the residual clauses—unconstitutionally vague. *See* 18 U.S.C. § 924(e)(2)(B)(ii) (defining "violent felony" to include felonies involving "conduct that presents a serious potential risk

4

of physical injury to another"); 18 U.S.C. § 16(b) (defining "crime of violence" as a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."). And those holdings were specific to the residual clauses, which required judges to depart from the categorical approach, "imagine" an "idealized ordinary case of the crime," estimate the risk of injury posed by that hypothetical crime, and then determine whether that risk was sufficient to be termed a "violent felony." *Johnson*, 576 U.S. at 597–98, 604. Three factors dictated the unconstitutional vagueness of the residual clauses: First, the "grave uncertainty" inherent in departing from the categorical approach and estimating the risk posed by a crime's "ordinary case." *Dimaya*, 138 S. Ct. at 1213–14. Second, the fundamental uncertainty in determining what level of imagined risk was sufficient to render a crime violent. *Id.* And finally, the "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause." *Johnson*, 576 U.S. at 598.

In contrast to the residual clauses, the CIMT definition relies on the categorical approach. *Nunez-Vasquez v. Barr*, 965 F.3d 272, 281 (4th Cir. 2020). That approach examines the elements of an offense and the least culpable conduct necessary to sustain a conviction. *Id.* at 281–82. It therefore does not require imagining the "ordinary case" of an offense. Likewise, it does not involve determining what level of imagined risk is sufficient. *See Dimaya*, 138 S. Ct. at 1215 ("[W]e do not doubt the constitutionality of applying [a] substantial risk [standard] to real-world conduct." (internal quotation marks omitted)). Finally, *Boggala* found no "evidence of unworkability surrounding [the CIMT definition] comparable to" the "repeated attempts and repeated failures to craft a principled and

5

objective standard" out of the residual clause. 866 F.3d at 570 (quoting *Johnson*, 576 U.S. at 598). The application of the categorical approach to define CIMTs thus avoids the aspects of the residual clauses that rendered them unconstitutionally vague in *Johnson* and *Dimaya*.

Underscoring this point, *Johnson* and *Dimaya* did not strike down the elements (or force) clauses of the violent felony definitions, which likewise rely on the categorical approach. *See* 18 U.S.C. § 924(e)(2)(B)(i) (defining "violent felony" to include crimes that have "as an element the use, attempted use, or threatened use of physical force against the person of another"); 18 U.S.C. § 16(a) (defining "crime of violence" as an "offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another"). Only one year after *Dimaya*, the Supreme Court applied the categorical approach to hold that Florida robbery constitutes a "violent felony" under the still-very-much-constitutional elements clause. *Stokeling v. United States*, 139 S. Ct. 544 (2019). If application of the categorical approach renders the elements clause definition of "violent felony" sufficiently concrete to overcome a vagueness challenge, it does the same for the CIMT definition. There is thus no indication that *De George*, which explicitly recognized the constitutionality of the CIMT definition, was implicitly overruled by *Johnson* or *Dimaya*. The CIMT definition provides sufficient notice to overcome a vagueness challenge and we remain bound by *De George* and *Boggala*.

III.

Canales Granados next argues that the statutory phrase "crime involving moral turpitude" impermissibly delegates a legislative function to the executive branch, violating

6

the nondelegation doctrine. He is right to point out that the nondelegation and void for vagueness doctrines may be "two sides of the same coin." Appellant's Br. at 34 (citing *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch, J., dissenting)). However, as with his previous constitutional argument, this argument is also foreclosed by Supreme Court precedent.

"The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019). However, the Supreme Court has held that "[a] statutory delegation is constitutional as long as Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* at 2123 (citation and internal quotation marks omitted). The question of whether Congress has provided this intelligible principle is one of statutory interpretation, considering a statute's purpose, background, and text. *Id.* "Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I." *Id.* The requirement of an intelligible principle is not an exacting standard. The Supreme Court has only twice invalidated statutes on nondelegation grounds, and only where "Congress had failed to articulate *any* policy or standard." *See id.* at 2129 (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)).

The CIMT statute satisfies the intelligible principle test. We have interpreted the phrase "moral turpitude" to require "two essential elements: a culpable mental state and reprehensible conduct." *Sotnikau*, 846 F.3d at 736. And to repeat: a culpable mental state requires at least criminal recklessness, while reprehensible conduct must "independently

7

violate[] a moral norm" and "shock[] the public conscience as being inherently base, vile, or depraved." *Id.* at 735–36.

It is not the case, then, that Congress has "failed to articulate *any* policy or standard" here. *Gundy*, 139 S. Ct. at 2129. In fact, the CIMT definition is clearer and more definite than many statutes sustained over the years. The Supreme Court has upheld delegations to regulate in the "public interest," to set "fair and equitable" prices and "just and reasonable" rates, and to issue air quality standards "requisite to protect the public health." *Id.* (collecting cases). And we have similarly approved broad delegations. *See United States v. Moriello*, 980 F.3d 924, 932–33 (4th Cir. 2020) (upholding authority to make rules "for the protection and administration of property owned or occupied by the Federal Government and persons on the property"); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092–94 (4th Cir. 1993) (upholding presidential authority under IEEPA to declare a "national emergency" in the face of threats to "to the national security, foreign policy or economy of the United States").

Because the meaning of "moral turpitude" is at least as clear as past acceptable delegations, we hold that Congress has sufficiently articulated an intelligible principle circumscribing executive discretion.

IV.

The third question presented by this appeal is whether Virginia felony eluding constitutes a CIMT. In analyzing whether an offense is a CIMT, courts "apply the categorical approach, which looks to the elements of the crime rather than the particular conduct underlying the conviction." *Nunez-Vasquez*, 965 F.3d at 281. Once again, a CIMT

8

has "two essential elements: a culpable mental state and reprehensible conduct." *Id.* at 282.

We conclude that Virginia felony eluding satisfies both elements.

A.

We begin with the culpable mental state requirement. For a crime to qualify as a

CIMT, a *mens rea* of at least recklessness is required.[*] *Sotnikau*, 846 F.3d at 736.

The Virginia felony eluding statute reads:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony. It shall be an affirmative defense to a charge of a violation of this subsection if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer.

Va. Code Ann. § 46.2-817(B). The statute's text therefore indicates that it contains two

elements: (1) the defendant received a visible or audible signal from a law enforcement

officer to bring his motor vehicle to a stop; and (2) the defendant drove his motor vehicle

in a willful and wanton disregard of such signal so as to interfere with or endanger the

operation of the law enforcement vehicle or a person. *See Graves v. Commonwealth*, 780

S.E.2d 904, 906 (Va. Ct. App. 2016). These elements satisfy the mental state requirement

for a crime to qualify as a CIMT.

---

[*] *Borden v. United States*, 141 S. Ct. 1817, 1825 (2021), which held that a *mens rea* of recklessness does not satisfy the standard for a "violent felony," is not germane to this well-settled precedent. *Borden* relied on the specific language of the elements clause definition of "violent felony," 18 U.S.C. § 924(e)(2)(B)(i), which focused on the "use of physical force against the person of another." The Court made clear that "a difference in text" would "yield[] a difference in meaning." *Borden*, 141 S. Ct. at 1833 (internal quotations omitted).

9

1.

Virginia felony eluding's statutory "willful and wanton" *mens rea* requires at least recklessness, and thus satisfies the CIMT culpability prong. Under Virginia law, "willful" means "knowing or intentional, rather than accidental," and "done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose." *Commonwealth v. Duncan*, 593 S.E.2d 210, 214 (Va. 2004). "Wanton" means "manifesting arrogant recklessness." *Forbes v. Commonwealth*, 498 S.E.2d 457, 459 (Va. Ct. App. 1998). Because the phrase "willful and wanton" imparts a *mens rea* of at least recklessness, it is sufficient to meet the CIMT culpability prong. *See Nunez-Vasquez*, 965 F.3d at 282–83 (determining that a statute could not qualify as a CIMT since it only required criminal negligence, rather than purpose or recklessness). Indeed, Canales Granados concedes as much. That concession is a wise one. Where it is clear both that a *mens rea* in a statute is at least that of recklessness, and the turpitudinous character of the statute is obviously in evidence, a statute constitutes a CIMT.

Here, of course, the *mens rea* is well above that of recklessness. Canales Granados contends, however, that the willful and wanton *mens rea* applies only to part of the statute's second element. This approach seeks to divvy up the statute into constituent parts at the expense of the whole of the conduct at issue. That is to say, the willful and wanton flight of a motor vehicle in a manner that endangers people or interferes with law enforcement vehicles. We decline to engage in the minute parsing of the statute that petitioner suggests. The only two words referencing *mens rea* in this provision are "willful" and "wanton." We are not at liberty to excise them from the Virginia statute. Indeed, to limit or dilute them

10

would not only deprive criminal defendants of protections that the *mens rea* has accorded them. It would also weaken the underlying purpose of federal immigration law.

Moreover, Canales Granados' argument also fails even on its own terms. To commit felony eluding, an offender must drive his motor vehicle "in a willful and wanton disregard of [a law enforcement] signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person." Va. Code Ann. § 46.2-817(B). Canales Granados argues that the willful and wanton *mens rea* applies to disregarding a law enforcement signal, but not to the interfering or endangering language. We reject this interpretation. The statute is best read to require both: (i) willful and wanton disregard of a law enforcement officer's signal and (ii) willful and wanton interference with a law enforcement vehicle or endangerment of a person.

The statutory language, taken on its own, suggests as much. The specified "willful and wanton" *mens rea* is presumed to apply to "all the subsequently listed elements of the crime*." United States v. Washington*, 743 F.3d 938, 942 (4th Cir. 2014) (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)). In fact, the phrase "so as to" explicitly links the "willful and wanton" *mens rea* with the interfering-or-endangering language it immediately precedes. In this context, the phrase "so as to" is best read as an idiomatic expression connecting an action (driving in willful and wanton disregard of a law enforcement signal) with its intended effect (willfully and wantonly interfering or endangering). *See* Christine Ammer, *The American Heritage Dictionary of Idioms* (1997) (defining "so as to" as "[i]n order to"). Under this natural reading, the willful and wanton

11

*mens rea* applies both to disregarding a law enforcement signal and to interfering with a law enforcement vehicle or endangering any person.

This interpretation of "so as to" is bolstered by other courts' interpretations of the same phrase in similar contexts. Courts regularly read "so as to" language to require a culpable mental state. *Blomstrom v. Tripp*, 402 P.3d 831, 845 (Wash. 2017) (holding that "so as to injure or abuse" "suggests deliberate action undertaken in order to cause harm"); *State v. Fierro*, 804 P.2d 72, 82 (Ariz. 1990) (interpreting "so as to injure or abuse" to require "intent to injure or abuse"); *State v. Sterzinger*, 649 N.W.2d 677, 680–83 (Wis. Ct. App. 2002) (interpreting "so as to interfere with or endanger the operation of the police vehicle" to require "purpose" rather than "result" of interference or endangerment); *State v. Mack*, 12 S.W.3d 349, 352 (Mo. Ct. App. 2000) (equating "so as to injure or abuse" with "intent to harm"); *Brimberry v. State*, 774 S.W.2d 773, 775–76 (Tex. Ct. App. 1989) (interpreting "so as to injure, damage or abuse" to require "intent," not "result"); *Commonwealth v. Moll*, 543 A.2d 1221, 1223 (Pa. Super. Ct. 1988) (interpreting "intentionally or recklessly tamper[ing] with tangible property of another so as to endanger person or property" to carry with it *mens rea* and thus require an "intent to place person or property in danger").

The function of "so as to" as language linking a specified *mens rea* to the result is bolstered by Virginia precedent on a different statute. The Virginia Supreme Court has interpreted the "so as to" phrase to import *mens rea* in Virginia's reckless driving statute. *See* Va. Code § 46.2-852. That court interpreted language prohibiting driving "recklessly or at a speed or in a manner *so as to* endanger the life, limb, or property of any person" to

12

require more than the mere result of endangerment. *Id.* (emphasis added); *Commonwealth v. Cady*, No. 201204, slip op. at 1–2 (Va. Oct. 28, 2021). Instead, the court viewed "so as to" as linking language that applied the *mens rea* to the result of endangerment. *Id.* (requiring "'disregard by the driver of a motor vehicle for the consequences of his act and an indifference to the safety of life, limb, or property' of others" (quoting *Powers v. Commonwealth*, 177 S.E.2d 628, 630 (Va. 1970))). While we would not presume to transfer the reading of Va. Code § 46.2-852 to the interpretation of the felony eluding statute before us in this case, we do note that the text of the Virginia felony eluding statute gives us every reason to apply the general presumption that a specified *mens rea* applies to each element of the statute. *Flores-Figueroa*, 556 U.S. at 650. Interfering or endangering therefore carries a willful and wanton *mens rea* sufficient to render the crime a CIMT.

2.

Next, Canales Granados cites the statutory affirmative defense available where "the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer." Va. Code Ann. § 46.2-817(B). Canales Granados claims that this defense demonstrates that ignoring the law enforcement signal requires a *mens rea* of only negligence.

We reject his argument because affirmative defenses are not considered under the categorical approach. The Supreme Court has made clear that courts may look only to the elements of the statute in implementing the categorical approach, not affirmative defenses. *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016); *Descamps v. United States*, 570 U.S. 254, 261 (2013); *see also Quito v. Barr*, 948 F.3d 83, 92–93 (2d Cir. 2020); *United*

13

*States v. Escalante*, 933 F.3d 395, 399–400 (5th Cir. 2019); *United States v. Velasquez-Bosque*, 601 F.3d 955, 963 (9th Cir. 2010).

And even if the affirmative defense were considered, it does not demonstrate that the statute can be violated through mere negligence. In the case of felony eluding, the affirmative defense is extraneous. It merely serves to underscore the willful and wanton *mens rea* required. A Virginia driver who does not stop at the direction of someone who is not objectively recognizable as a police officer has not committed felony eluding because he has not driven in "willful and wanton disregard of [a law enforcement] signal." Va. Code § 46.2-817(B). Only if he knew or "manifest[ed] arrogant recklessness," *Forbes*, 498 S.E.2d at 459, toward whether the individual signaling him to stop was an officer can he have willfully and wantonly disregarded a law enforcement signal. This requirement of a culpable state of mind is simply underscored by the affirmative defense.

Our approach to a judicially created affirmative defense in *United States v. Martin*, 753 F.3d 485, 493–94 (4th Cir. 2014), does not suggest a different result. Maryland fourth-degree burglary has no statutory *mens rea*, so Maryland courts created an affirmative defense requiring negligence. *Id.* Because binding state court precedent determined the crime could be committed with a negligent *mens rea*, this court found it did not qualify as a "crime of violence." *Id.* Here, however, there *is* a statutory *mens rea*: willful and wanton. And no Virginia court has held that the statutory affirmative defense lowers that bar.

A violation of Virginia felony eluding requires willful and wanton disregard of a law enforcement signal and willful and wanton interference or endangerment. Because

14

both aspects require a sufficiently culpable *mens rea*, there can be no doubt Virginia felony eluding meets the culpability prong to be considered a CIMT.

B.

Next, we turn to the reprehensible conduct requirement. For a crime to involve sufficiently reprehensible conduct to constitute a CIMT, it must "independently violate[] a moral norm" and "shock[] the public conscience as being inherently base, vile, or depraved." *Nunez-Vasquez*, 965 F.3d at 282. Since vehicular flight from law enforcement has been consistently found to involve sufficient risk and danger to be morally reprehensible, we conclude that Virginia felony eluding requires reprehensible conduct.

As the Supreme Court has noted, "[w]hen a perpetrator defies a law enforcement command by fleeing in a car, the determination to elude capture makes a lack of concern for the safety of property and persons of pedestrians and other drivers an inherent part of the offense." *Sykes v. United States*, 564 U.S. 1, 8 (2011). For the same reason, the Seventh Circuit concluded that Wisconsin's eluding statute was sufficiently turpitudinous because a defendant who intentionally flees from an officer "has to know that he is greatly increasing the risk of an accident." *Cano-Oyarzabal v. Holder*, 774 F.3d 914, 918 (7th Cir. 2014).

Canales Granados nevertheless argues that Virginia felony eluding does not require turpitudinous conduct because "conduct that raises the specter of endangerment," *Tucker v. Commonwealth*, 564 S.E.2d 144, 146 (Va. Ct. App. 2002), or conduct that endangers only the defendant, *Phelps v. Commonwealth*, 654 S.E.2d 926, 927 (Va. 2008), is sufficient for conviction. Raising the "specter of endangerment," is, however, sufficient to render a

15

crime morally reprehensible. Congress explicitly recognized the inherent danger of automotive flight by expressly deeming high-speed flight from an immigration checkpoint, 18 U.S.C § 758, a deportable offense. 8 U.S.C. § 1227(a)(2)(A)(iv). High-speed flight requires only flight in excess of the legal speed limit for conviction. 18 U.S.C § 758. The inherent risk associated with speeding is thus sufficient for deportation on its own— without any evidence the defendant actually interfered with or endangered anyone. Where, as here, actual endangerment or interference is required, the reprehensible nature of the conduct becomes indisputable. And that distinguishes this case from a case like *Nunez-Vasquez*, where we held that Virginia's hit-and-run statute did not qualify as a CIMT. 965 F.3d at 283. An individual could violate that statute merely by getting into an accident and failing to report his name, address, or other piece of identifying information, even if he remained at the scene of the accident. *Id.* Conduct such as that is simply different in kind from ignoring a signal from law enforcement and fleeing from the police.

Finally, Canales Granados argues that interference with "the operation of the law-enforcement vehicle" is akin to Virginia obstruction of justice, which this court held does not meet the CIMT conduct prong. *See Ramirez v. Sessions*, 887 F.3d 693, 704–06 (4th Cir. 2018). That comparison fails. There is a fundamental difference between vehicular flight from an officer and obstruction of justice. Flight carries with it an intrinsic element of risk and danger, *see United States v. Hudson*, 673 F.3d 263, 268 (4th Cir. 2012), while obstruction can be carried out with no risk of harm—and even from the safety of a defendant's home. Virginia courts have, for example, upheld obstruction convictions for actions as minor as demanding police officers leave a defendant's yard or refusing to roll

down a car window. *See Ramirez*, 887 F.3d at 705 (collecting cases). Comparing this relatively innocuous conduct to the danger inherent in vehicular flight is untenable.

*Ramirez*, in fact, supports the conclusion that interfering with a law enforcement vehicle through automotive flight is sufficiently turpitudinous. In *Ramirez*, the court rejected the argument that "any intent to obstruct, impair, or pervert the lawful operations of government necessarily involves moral turpitude." *Id.* at 705 (internal quotation marks omitted). The court instead required an "aggravating element that pushes a mere violation of the law into the territory of moral depravity." *Id.* at 704. The risk inherent in vehicular flight is the exact aggravating factor that elevates the interference involved with felony eluding above mere obstruction.

America is a welcoming country, but Congress has made plain that its hospitality is strained when people commit the sort of offense at issue in this case. The Virginia felony eluding statute clearly satisfies both the culpable mental state and reprehensible conduct prongs of a CIMT. We accordingly deny the petition.

*DENIED*